Joel W. Nomkin (AZ Bar No. 011939)
Christopher D. Thomas (AZ Bar No. 010482)
Austin Yost (AZ Bar No. 034602)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
Telephone:  (602) 351-8000
jnomkin@perkinscoie.com
cthomas@perkinscoie.com
ayost@perkinscoie.com

David Almeling* (CA Bar No. 235449)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701
dalmeling@omm.com

R. Collins Kilgore* (CA Bar No. 295084)
Vanessa Guerrero* (CA Bar No. 329915)
Greg Suhr* (CA Bar No. 328967)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA  90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6400
ckilgore@omm.com
vguerrero@omm.com
gsuhr@omm.com

*Attorneys for Plaintiffs*

[*Pro hac vice applications forthcoming*]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| B.A.D.J. on her own behalf and on behalf of her minor child, X.B.J.A., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. _____ <br><br> **COMPLAINT** |

# INTRODUCTION

1. This action seeks damages for an asylum-seeking family forcibly separated by the United States Government:  Belinda, and her minor daughter, Xenia.[1]

2. Nearly three years ago, Belinda and Xenia arrived at the United States border after fleeing violence in their home country of El Salvador.  They were detained shortly after their entry into the country from Mexico.  Federal officials took Belinda and Xenia to a frigid and unsanitary Arizona detention facility packed with other migrants.  On their first evening, a federal official alluded to the U.S. Government's plan to separate Belinda and Xenia.  When they began to cry in fear, the official mocked their cries with laughter.

3. Three days later, the United States Government took eight-year-old Xenia away from Belinda.  Belinda's pleas for an explanation were met with derision.  The officers whisked Xenia and the other crying children away, leaving Belinda and the other parents in despair.  Belinda had no idea where the U.S. Government was taking her young daughter, Xenia did not know where she was being taken, and neither knew if they would see the other again.  That was May 11, 2018.  It was the last time Belinda and Xenia saw each other.

4. Even though Xenia's father was just one state away in California, Xenia was taken into ORR custody and shipped across the country to a Florida shelter to live in the custody of complete strangers.  Belinda remained in detention in Arizona.

5. For an agonizing ten days following Belinda's and Xenia's forcible separation, the U.S. Government failed to establish any communication between the mother and daughter or provide them with information on the other's whereabouts and wellbeing.  Belinda's pleas to federal agents for information about her daughter

---

[1] Plaintiffs have filed a Motion to Proceed Under Pseudonyms concurrently with this Complaint. For ease of reference, "Belinda" refers to B.A.D.J., and "Xenia" refers to Belinda's minor daughter X.B.J.A.

COMPLAINT

CASE NO. _____

were mocked or ignored.  Belinda and Xenia did not speak until someone whom Belinda believed to be a social worker intervened on Xenia's behalf to track down Belinda and arrange a phone call between the mother and daughter.  The call was brief, as Xenia could not stop crying long enough to speak more than a few words.

6.      Though Xenia was released to her father in California in late May 2018, Belinda remained in detention until November 2018 while awaiting the outcome of her asylum claim.  The U.S. Government frequently transferred Belinda from one detention facility to another without explanation.  While detained, Belinda went without access to safe drinking water or a clean place to bathe or attend to personal hygiene.  When Belinda sunk into depression and began to suffer headaches, chest pain, and insomnia, the U.S. Government denied her adequate medical attention.

7.      Throughout Belinda's detention, multiple Immigration and Customs Enforcement officers told Belinda that her asylum claim had little to no chance of success and that she would be deported.  Belinda did not see an immigration judge until late October.  Even though Belinda passed a credible-fear interview with an asylum officer, the immigration judge denied her bond for release from detention. For Belinda, the seemingly endless deprivation of her liberty and separation from her daughter, disparaging remarks from ICE officials, and physical suffering compounded the emotional trauma of the forcible separation.  Hopeless and overwhelmed with grief, Belinda accepted deportation in November 2018.

8.      The U.S. Government's forcible separation of Belinda and Xenia was part of a cruel policy aimed at intentionally harming thousands of mostly Central American asylum-seeking families like Belinda and Xenia.  The U.S. Government designed its policy of forcible separation of migrant families to inflict terror and severe emotional harm on parents and their children.  The goal was to engage in conduct so shocking that word of the policy would spread throughout Central America, deterring others from seeking refuge in the United States.

COMPLAINT

CASE NO. _____

9.      That the U.S. Government targeted Central American immigrants is evidenced by, among other things, the pretextual nature of the stated justification for separating only those families (the vast majority of them Central American) arriving at the southern United States border, the unusual sequence of events leading to the promulgation of the policy, and contemporaneous statements by policymakers showing a marked animus toward Central American immigrants.[2] The family separation policy also disproportionately affected individuals from Central America:  more than 95 percent of the members in the *Ms. L v. ICE* certified class of immigrant parents separated from their children, including Belinda, are from Central American countries.

10.     When the U.S. Government split up these families, they failed to tell parents like Belinda where their children were being taken, whether the children would be safe, and whether or when the parents would ever see their children again. The U.S. Government also failed to implement even a basic tracking system that would ensure families could be reunited.  For weeks, sometimes months, parents had no way to comfort their young children.  The terrified children were left in the custody of complete strangers without any understanding about what had happened to them and their parents or why.

11.     Exacerbating the pain and uncertainty of separation were the inhumane conditions of detention.  Parents and children were left in cold, crowded, filthy cells.  Basic necessities were ignored.  Families lacked access to clean drinking water, sufficient food, meaningful medical attention, and adequate facilities and resources for personal hygiene.

12.     As the unwitting tools of this cruel policy, Belinda and Xenia and

---

[2] *See, e.g.*, Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), https://perma.cc/2HP4-PFYK (including El Salvador as a "shithole" country from which immigration to the United States should not be welcomed, and expressing a preference for immigrants "from countries such as Norway"); Donald J. Trump (@realDonaldTrump), Twitter (Jun. 19, 2018, 6:52 AM), https://perma.cc/MLC6-8VX5 (characterizing "illegal immigrants" as "pour[ing] into and infest[ing] our Country").

COMPLAINT
CASE NO. _____

thousands of other parents and children were left severely traumatized.

13.     Belinda and Xenia suffered, and continue to suffer, physical, mental, and emotional harm because of the intentional, reckless, and negligent acts of the U.S. Government through its policy of family separation and the cruel and chaotic manner of its execution.  The U.S. Government caused Belinda and Xenia's trauma for an inhumane policy objective.

14.     Because of the separation, Belinda is deeply depressed and anxious. While in U.S. custody, she was unable to eat or sleep and suffered from other stress-induced conditions.  Now in El Salvador, she continues to suffer both physical and emotional harms:  insomnia and trouble eating, as well as intense grief, guilt, and emotional pain.  Belinda continues to suffer from the trauma of the ten days following the separation during which she had no information regarding her daughter's whereabouts, the agonizing seven months of detention during which she wondered if she would ever see her daughter again, and her continued separation from Xenia and the fear that she may never reunite with her daughter.

15.     Xenia, too, continues to deal with the lasting harms of being separated from her mother.  For many months after the separation, while Belinda was still confined to a detention facility, Xenia was too distraught to speak with her mother. Xenia is still incapable of discussing with Belinda the circumstances of their separation because the trauma is so great.  Since the separation, Xenia has suffered severe emotional distress, including emotional volatility, mood swings, disproportionate emotional responses, and depression.

16.     The harm to Xenia is common among the children victimized by the U.S. Government's handling of asylum seekers, including the separation policy.  A report by the U.S. Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG") issued in September 2019 found that "intense trauma" was "common" among children who entered Office of Refugee Resettlement ("ORR") facilities in 2018, with children who had been "unexpectedly

COMPLAINT

CASE NO. _____

separated from a parent" facing additional trauma.[3]  According to this report, "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated.  Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents."[4]

17.     The trauma of forcible separation will affect Belinda and Xenia for the rest of their lives.  As Plaintiffs in this action, Belinda seeks redress for herself and on behalf of Xenia for the harm the U.S. Government has inflicted.  The U.S. Government is liable for this conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA").

18.     Plaintiffs seek monetary damages for the extensive injuries the conduct of the U.S. Government caused them.  The U.S. Government's conduct should not be tolerated in any civilized society.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1346(b), and the FTCA, 28 U.S.C. §§ 2671–2680.

20.     On May 5, 2020, Belinda submitted administrative claims to the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and the Department of Health and Human Services on her behalf and on behalf of her minor daughter Xenia.[5]

21.     None of the agencies has made a final disposition of either Plaintiff's administrative claim.  Because at least six months have passed since submission of

---

[3] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 9 (Sept. 2019) ("OIG HHS Report I"), *available at* https://perma.cc/2RPJ-WM5H.

[4] *Id.* at 10.

[5] Chad Mizelle, then Acting General Counsel of DHS, confirmed that Belinda's and Xenia's administrative complaints were received on May 5, 2020, in a letter to Belinda's and Xenia's counsel dated August 13, 2020.

COMPLAINT

CASE NO. _____

1   these claims, Plaintiffs now exercise their right to treat the claims as denied.  28

2   U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all available

3   administrative remedies.

4        22.     Venue is proper in this District under 28 U.S.C. § 1402(b) because the

5   acts and omissions that give rise to this action took place in this District.

6                                **THE PARTIES**

7        23.     Plaintiffs Belinda and her minor daughter Xenia are Salvadoran

8   nationals.  In April 2018, Belinda and Xenia fled from El Salvador to the United

9   States seeking asylum.  On or about May 9, 2018, the U.S. Government detained

10  them at a CBP facility in Arizona, and on or about May 11, 2018, the U.S.

11  Government forcibly separated Belinda and Xenia.  Belinda and Xenia have not

12  seen each other since that day.  Xenia now lives with her father, Belinda's husband,

13  in California.  Belinda was deported to El Salvador and remains there.  Belinda

14  brings this action on her own behalf and on behalf of Xenia, now age 11.

15       24.     Defendant United States of America is the appropriate defendant under

16  the FTCA.  28 U.S.C. §§ 1346(b), 2671, *et seq.*

17       25.     The federal officers referenced in this Complaint were at all relevant

18  times employees of the United States, working within the scope and course of their

19  employment with federal agencies, including, but not limited to HHS, including its

20  sub-agency ORR, and DHS, including its sub-agencies CBP, ICE, and USCIS.

21       26.     DHS employees were responsible for separating Plaintiffs.  DHS

22  employees are also responsible for supervising and managing detained individuals

23  at CBP and ICE facilities, including those located in Arizona, and later Georgia,

24  where Belinda was detained.

25       27.     HHS employees are responsible for supervising and managing the

26  detention of children the U.S. Government classifies as unaccompanied, including

27  at facilities in Florida where Xenia was detained.

28       28.     High-ranking officials from the above-named agencies worked

                                - 6 -

together to design and promulgate the unlawful and inhumane family separation policy, which subjected Plaintiffs to significant harm.

29.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

### I.     THE PROMULGATION AND IMPLEMENTATION OF THE U.S. GOVERNMENT'S FAMILY SEPARATION POLICY

#### A.     With Its Inhumane Family Separation Policy, the U.S. Government Intended to Inflict Severe Emotional Trauma on Asylum-Seeking Families

30.     Under the Trump Administration, curbing the number of individuals seeking asylum in the United States was a central focus of the U.S. Government's immigration policy.[6]

31.     To further its goal, the U.S. Government developed and implemented a deliberately cruel Family Separation Policy, which took thousands of children from

---

[6] *See, e.g.*, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU, Oct. 30, 2018, https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a33217240a539_story.html?noredirect=on&utm_term=.5e3bcec9eead; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019, https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html?action=click&module=Top%20Stories&pgtype=Homepage; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claimsidUSKCN1ND35K.

COMPLAINT

CASE NO. _____

their parents with knowing intent to cause terror, anguish, and emotional harm.  The purpose of the U.S. Government's cruel policy was to deter future migrants from seeking asylum in the United States.  The family separations—conducted only pursuant to executive policy, not any statute or regulation—violated the law, the U.S. Government's own internal policies,[7] and basic human decency.

32.     The U.S. Government used parents and children like Plaintiffs as tools to send a warning to would-be asylum seekers.

### 1.     The U.S. Government Began Planning a Family Separation Policy, Knowing It Would Cause Devastating Results.

33.     Beginning in February 2017, DHS officials began considering a policy of separating parents with children arriving at the U.S.-Mexico border as a means of deterring asylum seekers.[8]  The U.S. Government considered this policy even though officials knew of the harm it would cause.  Months earlier, the DHS Advisory Committee on Family Residential Centers had specifically advised DHS that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children" and results in

---

[7] CBP and ICE officers violated their non-discretionary obligations to abide by their own internal policies and standards when they separated families like Belinda and Xenia.  Section 1.9 of the Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ["TEDS"] states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."  TEDS at 4, *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.  Section 5.6 of the TEDS on "Detention" states that "Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures."  TEDS at 22.  Because no legal requirement or safety and security required plaintiffs' separation, CBP officers violated this standard by separating Xenia from Belinda.

[8] H.R. COMM. ON THE JUDICIARY, 116TH CONG., REP. ON THE TRUMP ADMINISTRATION'S FAMILY SEPARATION POLICY: TRAUMA, DESTRUCTION, AND CHAOS 6 (Oct. 2020) ("House Judiciary Committee Report"), *available at* https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519; Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017), https://perma.cc/P7DE-HX5A.

COMPLAINT
CASE NO. _____

1  "traumatic and detrimental impact."[9]

2      34.    Not only did the U.S. Government have ample notice of the disastrous

3  effects of the policy during the planning stage, as the separation policy became

4  more widely known it quickly drew additional internal[10] as well as external red

5  flags.  Outside organizations such as the American Academy of Pediatrics ("AAP")

6  warned the U.S. Government that the plan would affect "vulnerable, scared

7  children," urging policymakers to "exercise caution to ensure that the emotional

8  and physical stress children experience as they seek refuge in the United States is

9  not exacerbated by the additional trauma of being separated from their siblings,

10  parents, or other relatives and caregivers."[11]Nonetheless, then-Secretary of

11  Homeland Security, John Kelly, confirmed that DHS was pursuing the policy "in

12  order to deter more movement" along the route north from Central America taken

13  by many asylum seekers.[12]

14      **2.    The U.S. Government Launched Its Family Separation
       Policy with Knowing Intent to Cause Severe Emotional
15      Harm to Deter Future Asylum Seekers.**

16      36.    Despite advance warning of the devastating consequences of family

17  separation, the U.S. Government established a family separation pilot program in

18  CBP's El Paso sector in July 2017.  This marked the beginning of a U.S.

19  Government policy of widespread separation of asylum-seeking families at the

20  ─────────────────

21  [9] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2, 10 (2016), *available at* https://perma.cc/TZ9C-CUMC.

22  [10] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html;  *see also* H.R. SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS, COMMITTEE ON ENERGY AND COMMERCE HEARING (Feb. 7, 2019), Unofficial Transcript at ¶¶ 1006-1024; 1131-1138, *available at* https://perma.cc/F2EV-ZS9W (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services).

26  [11] Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

27  [12] House Judiciary Committee Report, *supra* note 8, at 6; *see also* Daniella Diaz, *Kelly:  DHS is considering separating undocumented children from their parents at the border*, CNN (Mar. 7, 2017), https://perma.cc/L4Q9-KVAW.

23
24
25

28

COMPLAINT
CASE NO. _____

country's southern border.

37.    The U.S. Government promulgated this policy specifically intending to deter immigration to the United States.[13]  U.S. Government officials at the highest levels knew of the trauma to children and parents that the policy would cause and embraced that result, believing that publicity about the harms would deter asylum-seeking families from immigrating to the United States.  Numerous sources—both at the highest levels of the U.S. Government and from outside the U.S. Government—document its knowing intent to cause severe emotional harm for purposes of immigration deterrence.  Any law enforcement rationale for the policy was mere pretext.

38.    As part of the El Paso pilot program, CBP targeted for criminal prosecution parents who crossed the border with children.[14]  The U.S. Government detained parents and forcibly took their children away, designated the children as unaccompanied minors (despite their having arrived with at least one parent), and placed the children in the custody of ORR.  Under the pilot program, the U.S. Government separated 281 individuals in families between July and November 2017.[15]

39.    ORR was ill equipped to process and care for the influx of separated children in its custody.[16]  Because ORR typically dealt only with *genuinely*

---

[13] *See* House Judiciary Committee Report, *supra* note 8, at 21; *see also 60 Minutes, Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird* (CBS Television Broadcast Nov. 25, 2018) (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *Policy Options to Respond to Border Surge of Illegal Immigration*, https://perma.cc/7KRZ-PXW7; *see also* Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/?utm_term=.6fce092b57af.

[14] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-BL-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 3 ("OIG HHS Report II") (Jan. 17, 2019); House Judiciary Committee Report, *supra* note 8, at 7.

[15] OIG HHS Report II, *supra* note 14, at 3.

[16] House Judiciary Committee Report, *supra* note 8, at 8-10.

COMPLAINT

CASE NO. _____

unaccompanied children, it lacked any formal system for noting that the separated children falsely classified as "unaccompanied" by CBP had parents in DHS custody. Nor did ORR have a system for tracking where the separated children's parents were detained.[17]

40. In November 2017, Judge Torres in the Western District of Texas sounded the alarm on the chaos of the family separation pilot program, finding that there "appears to be a total lack of information" given to parents separated from their children.[18] The U.S. Government ignored these concerns.[19]

41. By late 2017, the U.S. Government expanded the pilot from El Paso and was now separating families along the length of the U.S.-Mexico border, including families arriving through official ports of entry. Notwithstanding the warnings of many within ORR that it lacked the systems needed to handle the surge in children who had been separated from their parents and classified as unaccompanied, DHS discouraged HHS from taking steps to formalize and better prepare for continued increases.[20]

42. The U.S. Government was encouraged by the disastrous results of the pilot program. On December 16, 2017, a month after the pilot program ended, senior DOJ and DHS officials exchanged a memorandum titled "Policy Options to

---

[17] OIG HHS Report II, *supra* note 14, at 6.

[18] *U.S. v. Luz*, Nov. 1, 2017 Status Conference, Case No. 3:17-cr-02661-KC (W.D. Tex. June 11, 2018).

[19] Dep't of Justice, Office of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services*, Executive Summary at ii (January 2021) ("DOJ OIG Report") (concluding that, prior to full implementation of the policy, DOJ officials "did not seek readily available information" regarding the serious issues with the pilot program, despite concerns from prosecutors and judges regarding "the government's inability in many cases to identify the whereabouts of separated children.").

[20] *See* H.R. SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS, COMMITTEE ON ENERGY AND COMMERCE HEARING (Feb. 7, 2019), Unofficial Transcript at ¶¶ 1012-1024; 1131-1138; 2058-2064, *available at* https://perma.cc/F2EV-ZS9W (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services); *see also* House Judiciary Committee Report, *supra* note 8, at 8-10.

COMPLAINT

CASE NO. _____

Respond to Border Surge of Illegal Immigration."[21]  The first section of this memorandum, titled "Increase Prosecution of Family Unit Parents," suggests "[i]nstruct[ing] CBP and ICE to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border," noting that "[t]he parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present with them would be placed in HHS custody as UACs [unaccompanied alien children]."[22]  The memorandum also asserts that "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[23]  The memorandum's second section, titled "Separate Family Units," suggests "[a]nnounc[ing] that DHS is considering separating family units, placing the adults in adult detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs)," and concludes, "[o]nce legal coordination between DHS, HHS, and DOJ is complete, begin separating family units, as stated above."[24]

43.    Family separations continued along the U.S.-Mexico border for months after the end of the pilot program, with at least 625 children separated from their parents between December 2017 and March 2018.  This period was marked by the same chaos and tracking deficiencies that plagued the pilot program.[25]

44.    On April 6, 2018, President Trump issued a memo entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[26]  It directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, and the

---

[21] *Policy Options to Respond to Border Surge of Illegal Immigration*, https://perma.cc/7KRZ-PXW7; *see* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC NEWS (Jan. 18, 2019), https://perma.cc/6SVC-9Q3D.
[22] *Policy Options to Respond to Border Surge of Illegal Immigration*, https://perma.cc/7KRZ-PXW7.
[23] *Id*.
[24] *Id*.
[25] House Judiciary Committee Report, *supra* note 8, at 10-11.
[26] 83 Fed. Reg. 16,179 (Apr. 6, 2018).

COMPLAINT
CASE NO. _____

Secretary of Health and Human Services to submit a report detailing all of the measures their respective departments had pursued or were pursuing to end "'catch and release' practices."[27]

45.   "Catch and release" is a pejorative reference to a practice embraced by various administrations of allowing asylum seekers, among other groups of immigrants, to live in the community while awaiting their immigration hearings, rather than be held in government custody.[28]  This practice is in accord with immigration law.

46.   On the same day that President Trump issued his directive, then-U.S. Attorney General Jeff Sessions announced a "Zero Tolerance Policy," extending the practices of criminal prosecution and family separation tested in the El Paso pilot program to the entirety of the southern border.[29]  The Zero Tolerance Policy "fundamentally changed DHS' approach to immigration enforcement," which, except during the family separation pilot program in El Paso in 2017, did not separate a child from an accompanying adult except in very limited circumstances, such as where CBP determined that the adult was not the child's parent or guardian or the adult posed a danger to the child.[30]

47.   Again, sources from within and outside the U.S. Government put it on notice of the severe emotional trauma wrought by family separation well before the policy's full implementation.[31]  And throughout the life of the program, news

---

[27] *Id.*

[28] Katie Benner & Charlie Savage, *Due Process for Undocumented Immigrants, Explained*, NY TIMES, June 25, 2018, https://www.nytimes.com/2018/06/25/us/politics/due-process-undocumentedimmigrants.html.

[29] House Judiciary Committee Report, *supra* note 8, at 11.

[30] *See, e.g.*, OFF. OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY 2 (2018) ("DHS OIG Report I"), *available at* https://perma.cc/4E35-DQR5.

[31] *See e.g.*, U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2, 10 (2016), *available at* https://perma.cc/TZ9C-CUMC; Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

COMPLAINT

CASE NO. _____

articles and expert reports warning of the severe psychological harm of family
separation—from permanent emotional and behavioral problems for children up to
and including brain damage—continued to pour in.[32]

48.     Despite backlash and urgent warnings, in early May 2018, CBP
estimated to the Office of Management and Budget that it would separate *more than*
*26,000 children* from May through September 2018 under the Zero Tolerance
Policy.[33]  At the height of the Zero Tolerance period from May 7, 2018 to June 20,
2018—in which Belinda and Xenia were separated—the U.S. Government
separated at least 2,231 children from their parents.[34]

49.     When asked about the policy by NPR on May 11, 2018, John Kelly, by

---

[32] *See, e.g.*, Allison Abrams, *Damage of Separating Families:  The Psychological Effects on
Children*, PSYCHOL. TODAY (June 22, 2018),
https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-
separating-families (Children who are separated from a parent "develop insecure/disorganized
attachment and persisting high levels of stress."); *id*. ("[T]he effects of mother-child separation on
children's aggressive behavior are early and persistent."); Sarah Reinstein, *Family Separations
and the Intergenerational Transmission of Trauma*, CLINICAL PSYCHIATRY NEWS (July 9, 2018),
https://www.mdedge.com/psychiatry/article/169747/depression/family-separations-and-
intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional
dysregulation, aggression against self and others, difficulties in attention and dissociation,
medical problems, and difficulty with navigating adult interpersonal relationships."); Jeremy
Raff, *"The Separation Was So Long. My Son Has Changed So Much.":  U.S. Border Guards
Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply
Traumatized Child*, THE ATLANTIC, Sept. 7, 2018,
https://www.theatlantic.com/politics/archive/2018/09/trump-family-separation-children-
border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . .
Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress
that can damage health in both the short and long term[.]"); Olga Khazan, *Separating Kids From
Their Families Can Permanently Damage Their Brains:  A Pediatrician Explains How the
Trauma of Family Separation Can Change Biology*, THE ATLANTIC, June 22, 2018,
https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-
immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently
affect . . . children's brains, especially if it occurs early in childhood. . . . Studies show that high
levels of cortisol[, a stress hormone induced by separation] . . . can suppress the immune system
and change the architecture of a developing brain[.] . . . Another stress chemical, corticotropin-
releasing hormone, can damage the hippocampus, which plays a major role in learning and
memory.").
[33] OFF. OF THE INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OEI-09-18-00431, DHS LACKED
TECHNOLOGY NEEDED TO SUCCESSFULLY ACCOUNT FOR SEPARATED MIGRANT FAMILIES 17 (Nov.
2019), ("DHS OIG Report II"), *available at* https://perma.cc/GY3G-F8TG.
[34] House Oversight Staff Report (Jul. 2019), *available at* https://perma.cc/ZE5H-9FJZ.

COMPLAINT

CASE NO. _____

that point President Trump's Chief of Staff, responded that "a big name of the game is deterrence. . . .  It could be a tough deterrent—would be a tough deterrent."[35]  As for the children affected, he said:  "[t]he children will be taken care of—put into foster care *or whatever*."[36]

50.     On June 18, 2018, Fox News's Laura Ingraham asked Attorney General Sessions:  "Is this policy in part used as a deterrent?  Are you trying to deter people from bringing children or minors across this dangerous journey?"  Sessions replied, "I see that the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration.  So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[37]

51.     On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[38]

52.     While the U.S. Government claimed that it separated families only when the parents were referred for improper entry prosecution, it also separated many families who presented at official ports of entry seeking asylum, revealing that the purported law enforcement rationale was mere pretext.[39]  Additionally,

---

[35] *Transcript:  White House Chief of Staff John Kelly's Interview with NPR*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chiefof-staff-john-kellys-interview-with-npr.

[36] *Id.* (emphasis added).

[37] *The Ingraham Angle* (Fox News television broadcast Jun. 18, 2018), *available at* https://video.foxnews.com/v/5799065216001/#sp=show-clips.

[38] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-theadministration-officials-who-have-said-that-family-separation-is-meant-as-adeterrent/?utm_term=.6fce092b57af.

[39] *See Ms. L. v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) ("[T]he practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.").

- 15 -

although the U.S. Government claimed that it applied the "Zero Tolerance"
prosecutions evenhandedly, CBP targeted parents arriving with children over single
adults when making criminal referrals to DOJ.[40]  Even after a court enjoined further
separations, CBP continued looking for ways to separate families.[41]  Senior DOJ
Official Gene Hamilton has since admitted that DOJ would not otherwise have
prosecuted immigrant parents arriving with children if DHS did not refer such
parents for prosecution.[42]

53.     In response to intense public backlash against the policy, on June 20,
2018, President Trump issued an executive order purporting to end the policy of
family separation.  Exec. Order No. 13841, Affording Congress an Opportunity to
Address Family Separations (Fed. Register at 83 FR 29,435, June 25, 2018).

54.     On June 26, 2018, Judge Sabraw of the U.S. District Court for the
Southern District of California issued a preliminary injunction prohibiting the U.S.
Government from separating parents from their children absent a finding of parental
unfitness or danger to the child.  He ordered the U.S. Government to reunify parents
with children under age five within 14 days and children age five and older within
30 days of the order.[43]

55.     Even after Judge Sabraw's order, President Trump continued to openly
promote the deterrence rationale for the family separation policy well after the
official end of the Zero Tolerance aspect of the policy, declaring in December 2018
that "if you don't separate, FAR more people will come."[44]  In April 2019,
President Trump called the end of the family separation policy a "disaster" that led

---

[40] *See* TRAC Immigration, Syracuse University, "Zero Tolerance" at the Border:  Rhetoric vs.
Reality, *available at* https://perma.cc/EK2Q-CJ7G (July 24, 2018).
[41] House Judiciary Committee Report, *supra* note 8, at 18.
[42] DOJ OIG Report, *supra* note 19, at 33.
[43] *Ms. L.*, 310 F. Supp. 3d at 1146, 1149.
[44] *See* Donald J. Trump (@realDonaldTrump), Twitter (Dec. 16, 2018, 8:25 AM),
https://perma.cc/4EMP-JC34; *see also* Fox News, Interview:  Maria Bartiromo Interviews Donald
Trump on Fox Sunday Morning Futures (Apr. 28, 2019),
https://www.youtube.com/watch?v=hvUc7ONNTp4 at 1:32-2:21.

COMPLAINT

CASE NO. _____

1  to a surge in illegal immigration.[45]

2  56.     Following Judge Sabraw's order, the U.S. Government continued its

3  dedication to causing as much emotional harm as possible to separated families by

4  purposefully delaying reunification and persisting with new family separations.  For

5  example, in June 2018, CBP asked its Border Patrol chiefs and deputies to explore a

6  faster process of separation, prosecution, and reunification, apparently believing

7  separations that were shorter in duration would not violate Judge Sabraw's order.[46]

8  In July 2018, an ORR field supervisor wrote to ORR Deputy Director Jonathan

9  Hayes to complain that DHS staff were re-interviewing adults about their

10  immigration cases, instead of moving with all reasonable diligence toward the goal

11  of reunification.[47]

12  57.     A DHS directive, issued on June 23, 2018, suggested that once

13  families were separated, only parents who were subject to removal would be

14  reunited with their children, and only "for the purposes of removal."[48]  The U.S.

15  Government forced these parents to choose between their children and returning to

16  the harm from which they fled.

17  58.     In short, from 2017 up to and after the U.S. Government separated

18  Belinda and Xenia, senior government officials made the deliberate choice to cause

19  extraordinary pain and suffering to parents and children.[49]

20  _____

21  [45] Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019,

22  https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-

23  a82d3f3d96d5_story.html.  Mr. Trump's comments starkly contrast with those of former Deputy Attorney General Rod Rosenstein, who called the family separations "a failed policy that never

24  should have been proposed or implemented."  Julia Ainsley and Jacob Soboroff, *Justice officials respond to report on family separation by blaming Trump, expressing regret*, NBC NEWS (Jan.

25  14, 2021), *available at* https://www.nbcnews.com/politics/immigration/justice-officials-respond-new-report-family-separation-blaming-trump-expressing-n1254278.

26  [46] House Judiciary Committee Report, *supra* note 8, at 18.

27  [47] *Id.* at 19.

28  [48] U.S. DEP'T OF HOMELAND SEC., *Fact Sheet:  Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018), https://perma.cc/4X33-8C8D.

[49] President Trump continued to openly discuss the deterrence rationale for pursuing the family

COMPLAINT

CASE NO. _____

1
2

### B. The U.S. Government Applied the Separation Policy in a Deliberately Inhumane Manner to Cause Further Harm to Families

3

59.     The U.S. Government deliberately increased the emotional harm it

4

caused to Plaintiffs and other separated families by implementing the policy with

5

callous disregard for the physical safety, emotional well-being, and legal rights of

6

asylum seekers.

7

60.     The Attorney General announced the Zero Tolerance Policy in April

8

2018 without any prior notice to certain DHS and HHS (including ORR) officials,[50]

9

purposely giving those employees no time to plan for or coordinate

10

implementation.[51]

11

61.     As of at least November 2017, near the conclusion of the pilot

12

program, ORR was aware of an increase in the number of children in its custody,

13

many of them very young, who had been separated from their parents.[52]  Yet, the

14

separation policy well after the Zero Tolerance aspect of the policy was officially ended, declaring in December 2018 tweet that "if you don't separate, FAR more people will come."  *See* Donald J. Trump (@realDonaldTrump), Twitter (Dec. 16, 2018, 8:25 AM),

15

16

https://perma.cc/4EMP-JC34; *see also* FOX NEWS, Interview:  Maria Bartiromo Interviews Donald Trump on Fox Sunday Morning Futures (Apr. 28, 2019),

17

https://www.youtube.com/watch?v=hvUc7ONNTp4 at 1:32-2:21.  And, in April 2019, President Trump called ending family separation a "disaster" that purportedly led to a surge in illegal

18

immigration.  *See* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr.

19

28, 2019, https://washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-

20

a82d3f3d96d5story.html.

21

[50] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-19-163, UNACCOMPANIED CHILDREN:  AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER 12 (2018) ("GAO

22

REPORT"), *available at* https://perma.cc/UYZ9-UBYQ ("DHS and more officials told us that the agencies did not take specific planning steps because they did not have advance notice of the

23

Attorney General's April 2018 memo."); DOJ OIG Report, *supra* note 19, at 69 ("OAG urged

24

DHS to refer family unit adults to DOJ for prosecution without coordinating with the Southwest border U.S. Attorneys, the U.S. Marshals Service (USMS), the U.S. Department of Health and

25

Human Services, or the federal courts about this policy change and did not seek their input on issues and obstacles it would present.").

26

[51] A high-ranking HHS official testified before Congress that ORR considered planning for the increase but was specifically told not to.  *Id.*; *see also id.* at 14 ("DHS officials told [HHS

27

leadership] that DHS did not have an official policy of separating parents and children.").

28

[52] *See id.* at 12-13; DHS OIG REPORT II, *supra* note 33, at 15, 24; House Judiciary Committee Report, *supra* note 8, at 9.

COMPLAINT

CASE NO. _____

U.S. Government still failed to adequately prepare for the growth of this traumatized population or the needs of these vulnerable detainees when it expanded the pilot to the entire U.S.-Mexico border.

62.    This deliberate lack of planning resulted in the U.S. Government's failing to provide adequate detention facilities, track separated families, communicate with parents about their children's welfare, facilitate communication between separated family members, release children from CBP custody within the requisite 72 hours, and take basic care to comply with child welfare standards.  All of these failings and more compounded the harms already inflicted on families the U.S. Government had forcibly separated.

### 1.    The U.S. Government Subjected Families like Plaintiffs to Dangerous, Unclean Detention Facilities and Deprived Them of Necessities

63.    As a result of the U.S. Government's decision to apprehend thousands of families without appropriate planning,[53] the CBP initially placed detained families in dangerously overcrowded and cold holding cells known as *hieleras* (Spanish for "ice box"), an egregious violation of federal health and safety requirements.

64.    The U.S. Government failed to provide families with basic hygiene products and facilities, access to safe and sanitary restrooms, adequate food and clean drinking water, warm clothing to withstand the extreme cold of the *hieleras*, or bedding and a proper place to sleep.

65.    These cells were also so overcrowded that the detainees did not have enough room to sit or lie down to rest.  The overcrowding, lack of mattresses and

---

[53] The U.S. government has separated more than 5,000 families at the southern border since 2017. Joint Status Report at 1, 12, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. November 6, 2019), ECF No. 495 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has thus far recognized an additional 1,556 children as part of the expanded class); ECF 439-1 (Pls.' Mem. in Support of Mot. to Enf. Prelim. Inj.) at 7 (noting that government reported 911 child separations between June 26, 2018, and June 29, 2019, after the preliminary injunction was entered); *see also* OIG HHS REPORT II, *supra* note 14.

COMPLAINT

CASE NO. _____

blankets, and constant lighting in the *hieleras* deprived the detained families of sleep.

66.     In subjecting children to inhumane and unsafe conditions in CBP detention, the U.S. Government violated federal law and policy requiring that minors who are detained by CBP or other DHS agencies, or held in HHS custody, be held in "facilities that are safe and sanitary" and that account for "the particular vulnerability of minors."[54]  The U.S. Government violated requirements that minors detained by CBP be provided access to toilets and sinks, adequate temperature control and ventilation, and drinking water and food.[55]

67.     Parents like Belinda who were confined for months after being separated from their child were forced to continue enduring the emotional pain of the separation in squalid conditions, as the U.S. Government continued to deprive such parents of basic necessities, like clean water and facilities for hygiene, and withheld from them adequate medical care.

> **2.     The U.S. Government Failed to Track Familial Relationships, Deprived Parents of Information about Their Children's Whereabouts and Safety, Taunted Detainees Who Asked Questions, and Interfered with Legitimate Asylum Claims.**

68.     The U.S. Government exacerbated the trauma of separation by failing to provide information to parents about their children's whereabouts, well-being, and plan for custody.  U.S. Government officials also taunted and threatened parents who asked for such information.

69.     Although tracking separated children was as simple as adding a checkbox to an ORR/DHS referral page,[56] these two agencies primarily responsible

---

[54] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also* U.S. CUSTOMS & BORDER PROT., *U.S. Border Patrol Policy:  Hold Rooms and Short Term Custody* (2008); *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).
[55] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also Flores*, 913 F.3d at 916.
[56] *Oversight of the Trump Administration's Family Separation Policy:  Hearing Before the H. Comm. on the Judiciary* (Feb. 26, 2019) (statement of Scott Lloyd, Senior Advisor, Center for Faith and Opportunity Initiatives, U.S. Department of Health and Human Services, at 4),

COMPLAINT

CASE NO. _____

for implementing the policy instituted no "consistent way to indicate in their data systems children and parents separated at the border" until the summer of 2018.[57]

70.     The pilot program revealed that DHS was underprepared to track separated families through its information technology systems.[58]  According to the DHS Office of the Inspector General, CBP personnel "relied on local spreadsheets to document family separations," which led to data errors and "prevented ICE and CBP personnel in other locations from seeing where El Paso Sector Border Patrol agents had separated family members."[59]

71.     El Paso sector CBP officials raised concerns to CBP headquarters about technological deficiencies that compromised their ability to track family separations in their computer systems, but headquarters failed to make any changes in response to those concerns.[60]

72.     The pilot program had put the U.S. Government on notice of its inability to properly track separated families, as well as the need for better inter- and intra-agency coordination.  But the U.S. Government recklessly pressed on with expanding its practice of family separations to the rest of the U.S.-Mexico border without rectifying the failures in tracking and coordination.[61]  Known deficiencies predictably multiplied, leading to devastating results.

73.     CBP entered inaccurate and incomplete information in its systems and failed to link parents and children as separated families.[62]  These initial errors had a ripple effect through other government tracking systems:  ICE could not readily identify parents in its custody who had been separated from their children, and

---

available at https://perma.cc/P97Q-JB58.
[57] GAO REPORT, supra note 50, Highlights; see also id. at 16-19.
[58] See e.g., Luz Transcript, supra note 18.
[59] DHS OIG REPORT II, supra note 33, at 14–15.
[60] Id.
[61] See e.g., House Judiciary Committee Report, supra note 8, at 10 (noting CBP's awareness of the deficiencies in their records system at the end of the pilot program and their subsequent "fail[ure] to make any changes to [their] records systems to fix the tracking problem").
[62] See e.g., id. at 13-14.

COMPLAINT

CASE NO. _____

1    HHS/ORR systems lacked even a field to indicate that a child had been separated

2    from his or her parents until July 2018—creating the field only after a federal court

3    halted the practice of family separation.[63]

4          74.    One result of this failure was that the U.S. Government had no ready

5    records of where the children of thousands of parents were located and could not

6    promptly reunite parents and children,[64] even when ordered to do so by a U.S.

7    District Court.[65]

8          75.    After separation, parents and children often did not know each other's

9    whereabouts for extended periods, as was the case with Belinda and Xenia.  The

10   U.S. Government failed to provide parents with information regarding the location

11   or well-being of the parents' children or to enable communication between parents

12   and their separated children.[66]  The U.S. Government also violated federal law and

13   policy requiring that children held in ORR custody be provided "contact with

14   family members."[67]

15         76.    One Texas federal district court magistrate judge observed in January

16   2018, when addressing the U.S. Government's failure to track families separated

17   during the 2017 pilot of the family separation policy, that "[t]he practical effect" of

18   _____

19   [63] DHS OIG REPORT II, *supra* note 33, at 13, 21; *see also* House Judiciary Committee Report, *supra* note 8, at 17.

20   [64] DHS OIG REPORT II, *supra* note 33, at 9–11; House Judiciary Committee Report, *supra* note 8, at 18-21 (describing the government's chaotic reunification efforts); Kevin Sieff, *The Chaotic*

21   *Effort to Reunite Immigrant Parents with their Separated Kids*, WASH. POST (June 21, 2018), https://perma.cc/HQ6W-HLBK; Miriam Jordan, *Torn Apart by Zero Tolerance, Kept Apart by*

22   *Red Tape*, N.Y. TIMES (June 24, 2018), https://perma.cc/EY2J-XYPT.

23   [65] *See* Evan Halper, *Federal Investigators Find Many Failures in Trump's Family Separation Policy*, L.A. TIMES (Oct. 2, 2018), https://perma.cc/ZP4B-HQVE.  These circumstances led the

24   court to conclude that the "unfortunate reality" of the family separation policy was that "migrant children [were] not accounted for with the same efficiency and accuracy as *property*."  *Ms. L.*,

25   310 F. Supp. 3d at 1144.

26   [66] Halper, *supra* note 65; *see also United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *1–*2, *9 (W.D. Tex. Jan. 5, 2018); House Judiciary Committee

27   Report, *supra* note 8, at 15 (noting the government's inability to put children in contact with their parents for long periods).

28   [67] *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016) (citing *Flores v. Reno*, Stipulated Settlement Agreement, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997)); *see also* ORR Policy Guide § 3.3.10.

COMPLAINT

CASE NO. _____

1    this failure was "to create a 'blackout' period where parent and child are wholly

2    incommunicado from each other."[68]

3        77.    Adding to the harm caused by the separation policy and ensuing lack

4    of information, U.S. Government officials frequently insulted, threatened, and

5    taunted parents like Belinda during or after the process of taking their kids from

6    them.[69]

7        78.    Furthermore, the U.S. Government used separation as a means to

8    pressure parents to relinquish their asylum claims.  It leveraged the emotional

9    distress and fear parents experienced from their children having been taken to

10   coerce them into abandoning their asylum claims, including by amplifying the

11   parents' extreme duress with prolonged separation, pressuring them to sign forms

12   they could not understand, and representing to them over and over that their asylum

13   claims would fail.  Government agents also had a practice of coercing parents to

14   agree to deportation by deliberately misrepresenting to them that it was the only

15   way to see their children again.

16       79.    The U.S. Government's actions in coercing parents like Belinda to

17   abandon their asylum claims violated procedural due process, as well as mandatory,

18   nondiscretionary duties under federal statutes and regulations.  *See* 8 U.S.C.

19   § 1225(b)(1)(A)(ii); 8 C.F.R. §§ 235.4; 235.3(b)(4); 241.8(e).

20            **3.    The U.S. Government's Actions Created Conditions Ripe for
                      Child Abuse**

21

22       80.    The U.S. Government ignored applicable child welfare standards in its

23   rush to expand detention capacity to accommodate the influx of families affected by

24   _____

     [68] *Dominguez-Portillo*, 2018 WL 315759 at *9.

25   [69] Children, who were already under the extreme stress of separation, were not spared from insult
     either.  An audio clip released by ProPublica in June 2018 features children desperately crying

26   out for their mothers and children while a government official callously remarks:  "[w]ell, we
     have an orchestra here…What's missing is a conductor."  Ginger Thompson, *Listen to Children*

27   *Who've Just Been Separated From Their Parents at the Border*, PRO PUBLICA (June 18, 2018),
     https://www.propublica.org/article/children-separated-from-parentsborder-patrol-cbp-trump-

28   immigration-policy.

COMPLAINT

CASE NO. _____

the policy.  In so doing, the U.S. Government again violated mandatory, nondiscretionary duties.

81.    The family separation policy caused a sudden increase in the number of children, including very young children, in ORR custody.  Despite indicators by mid-2017 that larger numbers of very young children were entering ORR custody, ORR was unprepared to adequately care for these children.[70]

82.    Children age 12 and under are considered "tender aged."[71]  When those children enter ORR custody, they must be placed in special facilities licensed to care for younger children.

83.    The family separation policy caused the number of tender-aged children in ORR custody to swell and exceed ORR's capacity to house them in congregate care facilities.  Facilities such as Cayuga, Lutheran Services, and Bethany Christian Services had to quickly recruit additional foster families and place larger numbers of children in individual foster homes than had previously lived in those homes.

84.    These foster homes were ill prepared to house the number of children who came into their care.  The resulting abuses suffered by children were compounded by ORR's failure to properly plan for a large number of young children in its custody and to monitor the children in these foster homes.

85.    The U.S. Government's failure to ensure that children placed in ORR custody were in "facilities that are safe . . . and that are consistent with the [U.S. Government's] concern for the particular vulnerability of minors" violated its duties under the *Flores* consent decree.[72]

---

[70] OIG HHS Report II, *supra* note 14, at 6.

[71] *See* Dep't of Health & Human Servs., Latest UAC Data FY-2019, *available at* https://www.hhs.gov/programs/social-services/unaccompanied-alien-children/latest-uac-data-fy2019/index.html.

[72] *Flores v. Reno*, Stipulation Settlement Agreement § V ¶ 12.A; *see Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) (holding that *Flores* consent decree "unambiguously applies to accompanied minors").

COMPLAINT

CASE NO. _____

86.     The U.S. Government's failures to provide children with appropriate care and protection from abuse, track separated children, and tell their parents anything about their whereabouts and well-being evinces a motivation to maximize the suffering of the families it separated.

## II.     THE U.S. GOVERNMENT DELIBERATELY TRAUMATIZES BELINDA AND XENIA

### A.     Belinda and Xenia Seek Asylum in the United States

87.     Belinda and Xenia came to the United States to escape violent persecution in El Salvador and seek asylum.

88.     Belinda and Xenia fled El Salvador in late April 2018 and arrived at the U.S.-Mexico border on or about the evening of May 9, 2018.  That same night, Belinda and Xenia crossed the border at or near the city of San Luis, Arizona.

89.     CBP agents apprehended Belinda and Xenia immediately upon their entry.[73]  The agents searched Belinda and Xenia for weapons and asked them for information.  The agents took away Belinda's and Xenia's water bottle and confiscated their identification papers, including Xenia's birth certificate.

90.     The agents then placed Belinda and Xenia into a vehicle for transport to a CBP station along with some others who had recently crossed the border.  The vehicle was exceptionally hot and the air inside was thin.  When Xenia fell asleep, Belinda feared that her daughter had fainted from the heat.  Another woman in the car began to panic and cry due to the heat, leading to taunts from one of the agents outside the vehicle.

91.     At the CBP station, the agents made Belinda and Xenia sit on the floor along with many other individuals who had recently been apprehended at the border.  Belinda and Xenia waited hours.  Belinda asked the agents for food and water for Xenia, who had not been allowed to eat or drink anything for many hours. The agents ignored these requests.

---

[73] Belinda was not criminally charged for her entry into the United States in May 2018.

92.     After several hours, the agents called Belinda's name and asked her to provide information about herself and Xenia.  Belinda struggled to understand the agents who communicated with her in English and through hand gestures.  Putting together what she could, Belinda discerned that the agents were asking whether she stole Xenia.  The agents then proceeded to instruct Belinda to sign various documents that she could not read nor understand.  Although there were agents present who spoke Spanish, the agents failed to explain or translate the documents they asked Belinda to sign.

93.     A second agent called Belinda's name for further questioning.  This agent told Belinda, "You know we are going to take your daughter, right?"  Belinda began crying, insisting that they could not separate Xenia from her because Xenia was too young.  The agent laughed.  Xenia overheard this exchange and also became distraught.

94.     Xenia begged Belinda not to allow the officials to take her away.  Belinda tried to reassure her daughter.  But Belinda herself was in disbelief.  She had not heard of the U.S. Government separating asylum-seeking parents from their children.

95.     Belinda noticed many other women in the cell who were crying.  These women warned Belinda that the agents would soon take her daughter away.

96.     Upon realizing that the agent's warning was true and that Xenia would be taken, Belinda became panicked and began sobbing.  One of the agents teased Belinda for crying, suggesting that she was upset with the music the agents were playing.

**B.      Belinda and Xenia Are Kept in Inhumane Conditions While Awaiting Separation**

97.     Compounding the intense fear stoked by the U.S. Government agent's warning about the impending separation were the squalid conditions that Belinda and Xenia endured while in CBP detention.

98.     The U.S. Government held Belinda and Xenia in a crowded and frigid cell.  The cell was so crowded, many of the detained immigrants had to sleep sitting up.  The holding cell was also extraordinarily cold.  In addition, the agents kept the light on at all times, further disturbing the detainees' ability to sleep.

99.     Despite the extremely cold conditions, the agents did not provide Xenia or Belinda with clothes, blankets, or anything else to help them keep warm.  Another detained individual saw Xenia and Belinda shaking from the cold and offered them a thin aluminum sheet.  Even with the aluminum sheet, Belinda and Xenia continued to shiver from the cold and huddled together for warmth.

100.    The U.S. Government failed to provide the necessities for basic hygiene and cleanliness.  It did not give the detained individuals, including Belinda and Xenia, any hygiene products, such as soap, toothbrushes, or toothpaste.  It also failed to provide the detained individuals any facilities for showering or washing up.

101.    The U.S. Government did not provide adequate nutrition.  It fed the detained individuals two small meals a day.  Belinda remembers eating only ramen noodles.  The children received some sort of cracker snack.

102.    The U.S. Government never gave Belinda and Xenia any bottled water.  Instead, if detainees wanted water, they had to drink from the faucet in one of two small bathrooms.  Those bathrooms were filthy and rarely cleaned.  Used diapers piled up inside.  Many children became ill and used these bathrooms to throw up.

103.    Xenia's scalp became very itchy and irritated.  Belinda suspects that her daughter got lice from sleeping on the floor and living in cramped conditions with people who were deprived of the resources to properly wash themselves.

104.    From their cell, Belinda could see another cell or room full of crying children without any accompanying parents.  Belinda understood that these children had recently been taken from their parents and were awaiting some sort of

COMPLAINT

CASE NO. _____

processing.  Imagining Xenia in those conditions filled Belinda with dread.

### C.    The U.S. Government Takes Xenia Away

105.    The U.S. Government took Xenia from Belinda on or around the early morning of May 11, 2018.

106.    On that morning, at the beginning of Belinda's and Xenia's third day in custody, agents called their names.  Belinda, afraid that the agents intended to take Xenia, hesitated to wake her and respond to the agent.  The agent told Belinda that if she did not wake her daughter, he would enter the cell and forcibly remove Xenia himself.

107.    The U.S. Government first made Belinda and Xenia stand in a line with other parents and children waiting to provide officials with information.  At this time, Belinda and Xenia witnessed U.S. Government agents snatch a young boy from his mother's arms near the front of the line and shove the crying mother away.

108.    The U.S. Government agents informed the parents that the children needed to bathe because they "can't have dirty kids on the plane."  Belinda begged the federal agents to allow her to bathe Xenia since Xenia was so young and her scalp was irritated and hurting.

109.    After the children were bathed, the agents told the sobbing parents that they were now taking the children.  Belinda held Xenia and wept, repeatedly apologizing to her for what was happening.

110.    Belinda could not understand the agents when they spoke only in English.  But from their body language, facial expressions, and gestures, Belinda recognized that they were taking pleasure in the trauma they were inflicting.  Some agents laughed as the children were separated from their parents.

111.    One Spanish-speaking agent insisted the parents were making things harder than they had to be and shouted that they cut short their goodbyes.  Another agent scolded the grieving parents that their cries were inflicting trauma on the

1    children.

2    112.   As the agents led Xenia and the other children away, Belinda and

3    many other parents pleaded with the agents for information about where the

4    children were being taken.  The agents refused to tell the parents where the children

5    were going or what would happen to them.

6        **D.    Belinda and Xenia Are Not Allowed to Speak for Ten Days**

7    113.   For approximately ten days, the U.S. Government provided Belinda

8    with no information about Xenia's whereabouts or safety.  Following the

9    separation, the U.S. Government agents all but ignored Belinda and the parents

10   whose children had already been taken.

11   114.   An agent later called Belinda to sign some papers.  Belinda could not

12   understand these papers because they were only in English, which Belinda could

13   not read, write, or speak.  The agent did not translate for her.  During this

14   encounter, Belinda asked the agent where the U.S. Government took Xenia.  The

15   agent barked in Spanish that he had summoned Belinda to sign papers, not to give

16   her information.

17   115.   Belinda began to believe the agents were never going to tell her where

18   Xenia was.  Over the ten days following the separation, Belinda suffered from

19   intense anxiety and was unable to eat or sleep.  The sounds of other children in the

20   facility constantly reminded her of Xenia and their traumatizing separation.

21   116.   After approximately ten days, a Spanish-speaking woman whom

22   Belinda believed was a social worker called the facility to speak to Belinda.

23   117.   The social worker informed Belinda that Xenia was in Florida in the

24   custody of ORR.  The social worker told Belinda that she was working to secure

25   Xenia's release.  During the conversation, Belinda could hear her daughter's cries

26   in the background.

27   118.   The social worker explained that many of the children in ORR

28   detention had been having trouble eating and sleeping and disclosed to Belinda that

COMPLAINT

CASE NO. _____

Xenia had been crying a lot.  The social worker asked Belinda to remain calm during the call so that her daughter would not become emotional.

119.   When Belinda was allowed to speak with Xenia, the conversation was short.  Xenia was crying too hard to be able to say more than a few words.  She told Belinda that she did not want to be where she was and could not eat or sleep.

120.   The agents at the detention facility appeared to Belinda to have had no role in facilitating the call with Xenia.  Belinda believes that had the social worker not located her and arranged the call, Belinda and her daughter would not have been allowed to speak.  This was the only call Belinda had with Xenia while Xenia was in ORR custody.

**E.     The U.S. Government Releases Xenia After Over Two Weeks in Detention**

121.   After the U.S. Government forcibly separated Xenia from her mother in Yuma, Arizona, they put the shocked and scared young girl on a long flight to Florida instead of releasing her to her father in California.

122.   Because the U.S. Government decided to ship Xenia thousands of miles away rather than quickly reuniting her with a loving parent in the adjacent state, Xenia was forced to spend two weeks in a Florida shelter.  Immediate release to Xenia's father would have helped Xenia cope with the intense trauma of the forcible separation from her mother.  Instead, Xenia had to grieve amongst complete strangers.

123.   It was not until on or about May 26, 2018, approximately 15 days after her separation from Belinda, that the U.S. Government released Xenia to her father in California.  Xenia's father, with his limited income, had to pay for the plane ride from Florida to California.

**F.     Belinda Experiences a Prolonged Detention**

124.   The U.S. Government detained Belinda from May 9, 2018 to November 16, 2018.  During Belinda's detention, the U.S. Government

compounded the emotional pain of her forcible separation from Xenia.  For seven months, Belinda was deprived of liberty, afforded minimal information regarding her case, shuttled around from detention center to detention center in shackles, forced to live in inhumane conditions, and repeatedly told she would lose her asylum claim.  Belinda had no idea when she would see an immigration judge or whether she would ever be released or see her daughter again.

125.   During her lengthy detention, the U.S. Government transferred Belinda between many different detention facilities.  The U.S. Government first held Belinda at the Yuma Border Patrol Station in Yuma, Arizona, and then the Wellton Border Patrol Station in Wellton, Arizona.  Afterwards, the U.S. Government took Belinda back to the Yuma Border Patrol Station and then to a facility that Belinda recalls being named "Santa Cruz" (presumably in Santa Cruz County, Arizona). Finally, the U.S. Government moved Belinda across the country to a detention center in Ocilla, Georgia.

126.   During these transfers, agents shackled Belinda's ankles and wrists. During one transfer, Belinda was not provided with socks, and so the shackles cut into her ankles during the journey.

127.   With the exception of her transfer to the Ocilla, Georgia facility, the U.S. Government never told her where she was going or why she was being transferred.  Each time she would believe that the U.S. Government was in the process of deporting her, but each time she would only find herself in a new detention facility.

128.   These transfers also caused frequent gaps in communication between Belinda and her family.  On top of having to pay for the calls on a limited income, Belinda's husband had to figure out where she was being held after every transfer to arrange another call.

129.   At the Santa Cruz detention center, Belinda learned that some families were being reunited after seeing on a television in the detention center a news

COMPLAINT

CASE NO. _____

report that a court had ordered the government to reunite families and hearing from a fellow detainee that the U.S. Government was reuniting some families.

130.   She remembers hearing that the U.S. Government was reuniting some of her fellow detained parents with their children.  Belinda asked U.S. Government agents why she was not being reunited with her daughter, but none of the agents responded to her inquiry.

131.   When the U.S. Government transferred Belinda to Ocilla, Georgia, agents finally explained that she would wait there until the resolution of her asylum claim.

132.   Belinda came to believe that the U.S. Government moved her from Arizona to Georgia because the jurisdiction is more favorable to deporting asylum-seeking immigrants and having her asylum claim adjudicated there made it more likely that the claim would be denied.[74]

133.   In Ocilla, Belinda sank deeper into depression.  She cried constantly. The extraordinary emotional pain she felt kept her from eating or sleeping.

134.   Another detained woman in the Ocilla, Georgia facility warned Belinda that if she did not eat, the facility's officials would place her in isolation. Belinda forced herself to eat to avoid isolation.

135.   In Ocilla, the only drinking water available to Belinda came from two dirty bathrooms shared by hundreds of detainees.  Belinda was concerned that the water was unsanitary and might make her ill and therefore often went long periods without drinking any water.

136.   During her detention in the Ocilla, Georgia facility, Belinda began having chest pains, headaches, and difficulty breathing due to the immense stress of her separation from Xenia, lack of sleep, scant intake of food and water, and the

---

[74] *See e.g.*, Adrienne Pon, *Identifying Limits to Immigration Detention Transfers and Venue*, 71 STAN. L. REV. 747 (describing the government's "almost unfettered discretion" to transfer immigrant detainees, often resulting in transfers to jurisdictions hostile to immigrants, and noting frequent transfers to the Eleventh Circuit, which includes Georgia).

COMPLAINT

CASE NO. _____

other inhumane conditions of her detention.

137.   These symptoms required medical attention, so Belinda was provided access to a doctor in the facility.  The doctor did not speak Spanish, however, and the facility did not have an interpreter on site.  Instead, the Spanish-language interpreter was available only via telephone.  Because of the difficulty communicating, Belinda's consultation with the doctor was confusing to her. While the doctor gave Belinda pills to take for her symptoms, Belinda was not aware what medicine she had been given.

138.   Even though she did not know what she had been prescribed, Belinda took the medicine.  But the pills helped only slightly with Belinda's headaches, and her symptoms continued largely unabated.  Belinda subsequently explained to the doctor that she was still experiencing the same symptoms.  To the best of Belinda's knowledge, the doctor never prescribed her with any additional medication.

139.   Belinda also spoke with a mental health employee at the facility for her depression and insomnia.  She asked for medicine to help her sleep.  But the mental health employee told her the facility could not provide her with such medication.

140.   Belinda underwent a credible-fear interview with a USCIS asylum officer in Georgia on July 3, 2018.  The asylum officer found that Belinda had a credible fear of persecution.

141.   Despite the fact that Belinda arrived in the United States in early May and received a positive credible fear finding on or about July 3, Belinda did not see an immigration judge until on or about October 23, 2018.  On that day, Belinda had a custody redetermination hearing (also called a "bond" hearing) before an immigration judge to determine whether she could be released from immigration detention while her asylum case was pending.  She retained an attorney who attended her bond hearing.  Belinda was not allowed to be physically present at the bond hearing, but attended via video-conference from the detention facility.  Other

than a few preliminary, biographical questions and the outcome of the hearing, none of the proceedings were translated for her.  Belinda was not permitted to speak other than to answer the basic biographical questions posed to her during the proceedings.  The immigration judge denied Belinda's bond, labeling her a "flight risk" despite her clear intent to reunite with her family living in a known location in California.

142.   The immigration judge's ruling was an affirmation of the constant disparaging of her case that U.S. Government officials voiced to Belinda throughout her detention.  U.S. Government officials frequently told Belinda that her asylum claim would probably be denied and that she would be deported.  In doing so, these officials diminished nearly any hope Belinda had of seeing her daughter again and added to the staggering emotional pain that she had already experienced.  The immigration judge's bond denial dealt a final blow.

143.   By the time of her bond denial, Belinda had endured seven months of isolation, captivity, depression, anxiety, and the acute physical ailments that arose from many months of barely sleeping, eating, or drinking water.  Belinda's seemingly indefinite detention, the denial of her bond, and the repeated representations by various U.S. Government officials disparaging her chances of successfully claiming asylum filled her with hopelessness and compounded the emotional pain of her separation from Xenia.  Overwhelmed, exhausted, and disheartened, Belinda signed her deportation order to El Salvador in November 2018.[75]

---

[75] *See e.g.*, Order Granting In Part and Denying In Part Plaintiffs' Motion to Allow Parents Deported Without Their Children to Travel to the United States, *Ms. L.*, Case No. 3:18-cv-00428 (Sept. 4, 2019), ECF No. 456 (finding issues of voluntariness and granting motion to travel to the U.S. for several parents, including one mother, B.L.S.P., who was overcome by the stress of separation and one father, O.U.R.M., who was overcome by a U.S. Government official disparaging his chances of success).

COMPLAINT

CASE NO. _____

### G.   Belinda Attempts to Return to the United States to Be Reunited with Her Daughter

144.   Desperate to be reunified with her daughter, Belinda left El Salvador and tried to reenter the United States within weeks of her deportation.

145.   The U.S. Government apprehended Belinda at the border on or about December 17, 2018, detained her until March 2019, and deported her once more to El Salvador.

146.   Belinda's hopes of seeing her daughter again faded with her second deportation.  After returning to El Salvador again, she fell further into depression.  And Xenia too has had to cope with the realization that she will not see her mother any time soon.  This reality has put a strain not only on Belinda and Xenia's mental health but on their relationship as mother and daughter.

147.   Belinda and Xenia still have not been reunited.  Belinda remains in El Salvador.  Xenia lives in California with her father.  The last time Belinda and Xenia saw one another was the day the U.S. Government forcibly separated them.

### H.   Belinda and Xenia Continue to Suffer Emotional and Physical Harm.

148.   The facts alleged above have had a deep emotional toll on Belinda and Xenia.

149.   Belinda is very depressed, as confirmed by a mental health professional from whom Belinda has sought treatment.

150.   Belinda has not seen her daughter in over two-and-a-half years.  She suffers emotional distress whenever she thinks or speaks of the events in the United States, the separation from her daughter, and the demeaning treatment she experienced during her detention.  Her trauma manifests as depression, sadness, and anxiety, and she continues to suffer from insomnia and lack of appetite.

151.   Xenia continues to suffer the effects of her detention and separation from her mother.  She is now 11.  She has not seen her mother since she was eight.

COMPLAINT
CASE NO. _____

152.   Upon Xenia's release, she looked gaunt, exhausted, and depressed. When she was first released to her father in California, she asked about Belinda constantly.  She cried frequently, ate very little, and had trouble sleeping.

153.   Xenia has become more emotionally volatile.  Unlike before the separation, she now cries easily at the slightest provocation.  Xenia frequently expresses her pain from missing her mother.

154.   Belinda and Xenia have now resumed more regular communications. But Xenia is still unable to hear about or discuss the circumstances of their separation.  Xenia says things to her mother that indicate she is having trouble accepting that the separation may be permanent, such as when she told Belinda that she would not cut into her birthday cake until Belinda arrived in the U.S.  If the family is on an outing, Xenia will ask to take a picture of the outing for Belinda.  If Xenia is enjoying a meal with her family, she will ask to save some of the food for Belinda.  Xenia's feelings of joy are cut short by a constant yearning for her mother's company.

155.   Separating a child as young as Xenia from her parent has long been known to cause significant short- and long-term damage to mental, physical, and emotional health.[76]  Children attach to their caregiver from the time they are born, and a child's sense of safety "depends on that relationship."[77]  Disrupting that relationship causes "the parts of the brain that deal with attachment and fear" to "develop differently."[78]  It is not surprising, then, that "[s]eparation irreparably harms [families] every minute it persists."[79]

156.   The AAP has explained the effects of separation on children:

---

[76] See Ms. J.P. v. Sessions, 2019 WL 6723686, *40-41 (Nov. 5, 2019 C.D. Cal.) (granting preliminary injunction and ordering the government to provide free mental health care to families who were separated).
[77] William Wan, What Separation from Parents Does to Children:  'The Effect is Catastrophic', WASH. POST (Jun. 18, 2018), https://perma.cc/7MA6-X7MB.
[78] Id.
[79] Jacinto-Castanon de Nolasco, 319 F. Supp. 3d at 503.

COMPLAINT
CASE NO. _____

1    "[H]ighly stressful experiences, like family separation, can . . . disrupt[] a child's

2    brain architecture and affect[] his or her short- and long-term health.  This type of

3    prolonged exposure to serious stress—known as toxic stress—can carry lifelong

4    consequences for children."[80]  Children who experience trauma like forced

5    separation from a parent "are at a much greater risk of developing mental health

6    disorders such as depression, anxiety, addiction, Attention Deficit Hyperactivity

7    Disorder ('ADHD') and PTSD.  Their physical health is also negatively affected."[81]

8        157.   The current symptoms Xenia is experiencing are consistent with the

9    effects of separation from a parent, and as a result of the U.S. Government's actions

10   she will suffer lifelong harm.

11   ## III.    CONSEQUENCES OF THE U.S. GOVERNMENT'S WRONGFUL ACTS

12

13       158.   The U.S. Government knew that forcibly separating Plaintiffs would

14   fill them with terror, desperation, and anguish.  Indeed, that was the point.  The

15   U.S. Government's actions were designed to and did cause Plaintiffs and similarly

16   situated migrants severe trauma and emotional distress.  This harm was intended to

17   serve the U.S. Government's express purpose of deterring future asylum-seeking

18   families from coming to the United States.

19       159.   The U.S. Government then compounded that trauma by, among the

20   other things described above, detaining Plaintiffs in inhumane conditions,

21   emotionally abusing them, separating Plaintiffs without any plan for reuniting them,

22   refusing to tell Plaintiffs anything about the other's whereabouts or well-being,

23   refusing to allow Plaintiffs to speak to each other for roughly ten days, subjecting

24   _____

25   [80] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 503 (quoting Colleen Kraft, Am. Acad. of
     Pediatrics, AAP Statement Opposing Separation of Children and Parents at the Border (May 8,
26   2018), https://perma.cc/23ET-GN7S); *see also* Allison Abrams, LCSW-R, *Damage of Separating
     Families:  The Psychological Effects on Children*, PSYCHOL. TODAY (Jun. 22, 2018),
27   https://perma.cc/H967-BBWV (Because a child's "secure attachment comes from the child's
     perceptions of his or her caregiver's availability (physical accessibility) . . . separations as brief as
28   one week in duration could negatively impact the quality of attachments.").
     [81] Abrams, *supra* note 80.

COMPLAINT

CASE NO. _____

Belinda to a prolonged detention in squalid conditions after Xenia's release, failing to provide Belinda adequate medical attention, transferring Belinda from one detention facility to another without explanation, making Belinda wait six months before allowing her to see an immigration judge, and constantly disparaging Belinda's chances of success on her asylum claim.

160.   Plaintiffs will carry the harm done to them for the rest of their lives. The U.S. Government's conduct here is unconscionable, and it cannot be excused in a civilized society.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

161.   Plaintiffs re-allege each allegation in the preceding paragraphs as though fully set forth here.

162.   The U.S. Government, federal officials, and federal employees referenced above engaged in extreme and outrageous conduct with an intent to cause, or at least a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

163.   The behavior of the U.S. Government, federal officials, and federal employees referenced above was extreme and outrageous under the circumstances, particularly in light of Plaintiffs' recent flight from persecution.

164.   As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress throughout their time in the U.S. Government's custody and continue to suffer the lasting effects of that distress today.

165.   Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the U.S. Government is liable to Plaintiffs for intentional infliction of emotional distress.

COMPLAINT

CASE NO. _____

1

## COUNT TWO
## NEGLIGENCE

2

3    166.   Plaintiffs re-allege each allegation in the preceding paragraphs as

4    though fully set forth here.

5    167.   The U.S. Government, federal officials, and federal employees

6    referenced above had a legal duty to Plaintiffs to act with ordinary care and

7    prudence so as not to cause harm or injury to Plaintiffs.

8    168.   The U.S. Government, federal officials, and federal employees

9    referenced above failed to act with ordinary care and breached their duty of care

10   owed to Plaintiffs.  The U.S. Government also breached the above-referenced

11   mandatory, nondiscretionary duties.

12   169.   As a direct and proximate result of the U.S. Government's breach,

13   Plaintiffs suffered substantial damages.

14   170.   Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680,

15   the U.S. Government is liable to Plaintiffs for negligence.

16

## COUNT THREE
## LOSS OF CHILD'S CONSORTIUM

17

18   171.   Plaintiffs re-allege each allegation in the preceding paragraphs as

19   though fully set forth here.

20   172.   Xenia suffered severe, permanent, and disabling injuries, including

21   long-term mental health effects and trauma caused by the U.S. Government, federal

22   officials, and federal employees referenced above.

23   173.   Those injuries and Plaintiffs' continued separation substantially

24   interfere with Xenia's capacity to interact with her mother in a normally gratifying

25   way.

26   174.   Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680,

27   the U.S. Government is liable to Belinda for loss of consortium.

28

COMPLAINT

CASE NO. _____

1

## PRAYER FOR RELIEF

2      WHEREFORE, Plaintiffs respectfully demand as follows:

3      A.      Compensatory damages;

4      B.      Attorneys' fees and costs pursuant to, among other provisions, the

5  Equal Access to Justice Act, 28 U.S.C. § 2412; and

6      C.      Such other and further relief as the Court may deem just and

7  appropriate.

8

9      Respectfully submitted this 08 day of February 2021.

10

11

12                              PERKINS COIE LLP

13                              By /s/ Joel W. Nomkin
                                   Joel W. Nomkin
14                                 Christopher D. Thomas
                                   Austin Yost
15

16                              O'MELVENY & MYERS LLP

17                              By /s/ David Almeling
                                   David Almeling*
18                                 R. Collins Kilgore*
                                   Vanessa Guerrero*
19                                 Greg Suhr*

20                              [*Pro hac vice applications forthcoming]

21

22

23

24

25

26

27

28

- 40 -