Joel W. Nomkin (AZ Bar No. 011939)
Christopher D. Thomas (AZ Bar No. 010482)
Austin Yost (AZ Bar No. 034602)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
Telephone:  (602) 351-8000
jnomkin@perkinscoie.com
cthomas@perkinscoie.com
ayost@perkinscoie.com

David Almeling* (CA Bar No. 235449)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701
dalmeling@omm.com

R. Collins Kilgore* (CA Bar No. 295084)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA  90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6400
ckilgore@omm.com

*Attorneys for Plaintiffs*

[*Admitted pro hac vice*]

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| B.A.D.J. on her own behalf and on behalf of her minor child, X.B.J.A.,<br><br>Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. CV-21-00215-PHX-SMB<br><br>**FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

# INTRODUCTION

1.     This action seeks damages for an asylum-seeking family forcibly separated by the United States Government:  Belinda, and her minor daughter, Xenia.[1]

2.     More than four years ago, Belinda and Xenia arrived at the United States border after fleeing violence in their home country of El Salvador.  Only a few days prior to their arrival, U.S. Government officials began executing a policy of separating nearly all Central American families arriving at the U.S.-Mexico border.  Belinda and Xenia were detained shortly after entering the United States from Mexico.  U.S. Customs and Border Protection ("CBP") agents took Belinda and Xenia to a frigid and unsanitary Arizona detention facility packed with other migrants, which was unprepared to adequately house the mix of adults and children in the agents' care due to CBP officials' and agents' lack of sufficient planning for the influx of detainees.  In particular, overcapacity at the CBP facility meant that Belinda, Xenia, and the other detainees were not provided with adequate food, water, and sanitation, in violation of the *Flores* agreement and government policy.  And the CBP agents there failed to exhibit basic levels of care, decency, and professionalism in their treatment of families who were about to be separated.  The Border Patrol Agents assigned to the facility told Belinda that her daughter would be taken from her, and during Belinda and Xenia's detention tormented them with the prospect of separation.  When Belinda and Xenia cried in fear and exhibited other signs of emotional distress, CBP agents mocked their cries with laughter and demeaning comments.  The agents also kept recently separated children, who were screaming and crying, in a cell within view of the yet-to-be separated families.

3.     Three days after Plaintiffs arrived at the CBP facility, U.S.

---

[1] On April 27, 2021, the Court granted Plaintiffs' Motion to Proceed Under Pseudonym.  For ease of reference, "Belinda" refers to B.A.D.J., and "Xenia" refers to Belinda's minor daughter X.B.J.A.

Government officials[2] took eight-year-old Xenia away from Belinda.  Belinda pleaded to various federal agents to know would happen to her daughter—where Xenia would be taken and whether she would be safe.  The CBP agents at the facility, and any agents of the U.S. Immigration and Customs Enforcement ("ICE") or the U.S. Department of Health and Human Services ("HHS") present for the separations, refused to give Belinda any information at all.  The officers whisked Xenia and the other crying children away, leaving Belinda and the other parents in despair.  Belinda had no idea where the U.S. Government was taking her young daughter, Xenia did not know where she was being taken, and neither knew if they would see the other again.  That was May 11, 2018.  Belinda and Xenia would not be reunited for more than three years.

4.     Even though Xenia's father was just one state away in California, Xenia was taken into Office of Refugee Resettlement ("ORR") custody and shipped across the country to a Florida shelter to live for more than two weeks in the custody of complete strangers.  Belinda remained in CBP detention in Arizona for weeks.

5.     For approximately ten agonizing days following Belinda's and Xenia's forcible separation, agents of the U.S. Government failed to establish any communication between the mother and daughter and refused to provide them with information on the other's whereabouts and wellbeing.  Belinda's pleas to federal agents, including agents of CBP, for information about her daughter were mocked or ignored.  U.S. Department of Homeland Security ("DHS") and HHS agents— including the Border Patrol Agents in charge of Belinda's custody at the Yuma and

---

[2] Generally, Plaintiffs do not know the names of the federal agents they encountered while in custody.  The U.S. Government has refused to provide Plaintiffs with the names of the agents and officials at CBP, ICE, ORR, or other departments that Plaintiffs encountered—the records that the U.S. Government has produced to Plaintiffs have been redacted to remove names and other identifying information.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

Wellton Border Patrol Stations, Belinda's Deportation Officer, Xenia's ORR Case Officer, and officials within DHS and HHS who had responsibility for tracking separated migrant parents and children including Belinda and Xenia—deliberately and/or negligently failed in their duty to facilitate communication between the mother and daughter in their custody.  DHS and HHS officials were aware that they were unprepared to handle the influx of families and to keep track of the children sent to ORR facilities, yet they proceeded anyway without taking the time to plan and prepare to meet their legal duties to the parents and children in their care.   As a result, Belinda and Xenia did not speak until approximately ten days after their initial separation, when Belinda was finally put in touch with Xenia over the phone. The call was brief, as Xenia could not stop crying long enough to speak more than a few words.  And the two did not speak again until well after Xenia had left ORR custody.  These facts show a breach by DHS and HHS officials of their duties to Plaintiffs, including under the *Flores* Agreement and DHS and HHS regulations and policy.

6.      Though Xenia was released to her father in California in late May 2018, Belinda remained in detention until November 2018 while awaiting the outcome of her asylum claim.  CBP and ICE agents frequently transferred Belinda from one detention facility to another without explanation.  Belinda was detained in different CBP facilities for more than two weeks before her eventual transfer to ICE detention.  While detained, Belinda went without access to safe drinking water or a clean place to bathe or attend to personal hygiene.  When Belinda sunk into depression and began to suffer headaches, chest pain, and insomnia, the ICE officials responsible for her during her custody, including her Deportation Officer, failed to provide her with adequate medical attention.

7.      Throughout Belinda's detention, multiple ICE officers told Belinda that her asylum claim had little to no chance of success and that she would be deported.  Belinda did not see an immigration judge until late October.  Even

though Belinda passed a credible-fear interview with an asylum officer, the immigration judge denied her bond for release from detention.  For Belinda, the seemingly endless deprivation of her liberty and separation from her daughter, disparaging remarks from ICE officials, and physical suffering compounded the emotional trauma of the forcible separation.  Hopeless and overwhelmed with grief, Belinda accepted deportation in November 2018.

8.      The U.S. Government's forcible separation of Belinda and Xenia, carried out by agents and officials of CBP, ICE, and ORR, was part of a cruel policy aimed at intentionally harming thousands of mostly Central American asylum-seeking families like Belinda and Xenia.  The goal was to engage in conduct so shocking that word of the policy would spread throughout Central America, deterring others from seeking refuge in the United States.  But the officials responsible for designing and executing the policy were still confined by legal duties in how they planned and carried out the separations of human beings in their care.  The U.S. Government officials—including not only policymakers within DHS and HHS, but also agents and officials of CBP, ICE, and ORR, responsible for separating, detaining, and keeping track of migrant parents and children for the purposes of communication and potential reunification—designed and executed the forcible separations of migrant families in an unlawful manner that inflicted terror and severe emotional harm on parents and their children, not just because the families were separated, but also due to the botched planning and careless execution of the policy.

9.      That these officials targeted Central American immigrants is evidenced by, among other things, the pretextual nature of the stated justification for separating only those families (the vast majority of them Central American) arriving at the southern United States border, the unusual sequence of events leading to the promulgation of the policy, and contemporaneous statements by

policymakers showing a marked animus toward Central American immigrants.[3] The family separation policy also disproportionately affected individuals from Central America:  more than 95 percent of the members in the *Ms. L v. ICE* certified class of immigrant parents separated from their children, including Belinda, are from Central American countries.

10.   When the CBP, ICE, and ORR agents and officials split up these families and detained them post-separation, they failed to give parents like Belinda information about where their children were being taken, whether the children would be safe, and whether or when the parents would ever see their children again. These agents, and the DHS and HHS officials responsible for overseeing the detention of separated family units, also failed to implement even a basic tracking system that would ensure families could be reunited.  Yet, at the same time, the agents routinely logged and tracked personal possessions so that they could be returned to individuals after their detention.  Accordingly, these agents failed to treat Belinda and Xenia and other migrant families with even the level of care used for property.  For weeks, sometimes months, parents had no way to comfort their young children.  The terrified children were left in the custody of complete strangers without any understanding about what had happened to them and their parents or why.

11.   Exacerbating the pain and uncertainty of separation were the inhumane conditions of detention resulting from DHS officials and agents' failure to plan for the influx of families and coordinate with other agencies like DOJ and HHS to ensure that detainees would be transferred out of CBP facilities in a timely fashion.

---

[3] *See, e.g.*, Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), https://perma.cc/2HP4-PFYK (including El Salvador as a "shithole" country from which immigration to the United States should not be welcomed, and expressing a preference for immigrants "from countries such as Norway"); Donald J. Trump (@realDonaldTrump), Twitter (Jun. 19, 2018, 6:52 AM), https://perma.cc/MLC6-8VX5 (characterizing "illegal immigrants" as "pour[ing] into and infest[ing] our Country").

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

As a result, CBP lacked the resources to house and care for families like Belinda and Xenia when Zero Tolerance launched.  Parents and children were left in cold, crowded, filthy cells.  Basic necessities were ignored.  Families lacked access to clean drinking water, sufficient food, meaningful medical attention, and adequate facilities and resources for personal hygiene because the CBP agents were either unwilling or too overwhelmed to provide those necessities.  These failures violated the *Flores* agreement and federal regulations and policy, in particular for the detention and care of minors.

12.     As the unwitting tools of this cruel policy and its hapless rollout, Belinda and Xenia and thousands of other parents and children were left severely traumatized.

13.     Belinda and Xenia suffered, and continue to suffer, physical, mental, and emotional harm because of the intentional, reckless, and negligent acts of the CBP, ICE, and ORR agents and officials who cruelly and chaotically executed the policy of family separation.  The CBP, ICE, and ORR agents and officials caused Belinda's and Xenia's trauma by, among other things, carrying out the pre-separation detention and the separations themselves in an unplanned and chaotic manner that maximized terror and emotional distress, violating their duties to facilitate communication between Belinda and Xenia during detention, failing to provide them information about each other's wellbeing, and neglecting other duties to provide humane treatment to children in U.S. Government custody.

14.     Because of the separation, Belinda is deeply depressed and anxious. While in U.S. custody, she was unable to eat or sleep and suffered from other stress-induced conditions.  Since her release, she has continued to suffer both physical and emotional harms:  insomnia and trouble eating, as well as intense grief, guilt, and emotional pain.  Belinda has experienced lasting harm from the trauma of her separation from her daughter, including the ten days following the separation during which CBP, ICE, and ORR agents and officials deprived her of

communication with her daughter and any information regarding her daughter's whereabouts or wellbeing, compounded by the agonizing seven months of detention during which she wondered if she would ever see her daughter again.

15.    Xenia, too, continues to deal with the lasting harms of being separated from her mother and deprived of her mother's comfort, including for the approximately ten days in ORR custody until she was finally allowed to hear her mother's voice.  For months, Xenia was too distraught to speak with her mother at all.  And for years, it was too traumatic for Xenia to even speak with Belinda about the circumstances of their separation.  Since the separation, Xenia has suffered severe emotional distress, including emotional volatility, mood swings, disproportionate emotional responses, depression, and disordered eating.  These symptoms are consistent with post-traumatic stress in children.

16.    The harm to Xenia is common among the children victimized by the separation policy and its cruel and reckless execution.  A report by the U.S. Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG") issued in September 2019 found that "intense trauma" was "common" among children who entered Office of Refugee Resettlement ("ORR") facilities in 2018, with children who had been "unexpectedly separated from a parent" facing additional trauma.[4]  According to this report, "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated.  Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents."[5]

17.    The trauma of forcible separation will affect Belinda and Xenia for the

_____

[4] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 9 (Sept. 2019) ("OIG HHS Report I"), *available at* https://perma.cc/2RPJ-WM5H.
[5] *Id.* at 10.

rest of their lives.  As Plaintiffs in this action, Belinda seeks redress for herself and on behalf of Xenia for the harm the U.S. Government has inflicted.  The U.S. Government is liable for this conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA").

18.    Plaintiffs seek monetary damages for the extensive injuries the conduct of the U.S. Government caused them.  The U.S. Government's conduct should not be tolerated in any civilized society.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1346(b), and the FTCA, 28 U.S.C. §§ 2671–2680.

20.    On May 5, 2020, Belinda submitted administrative claims to the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and the U.S. Department of Health and Human Services ("HHS") on her behalf and on behalf of her minor daughter Xenia.[6]

21.    None of the agencies has made a final disposition of either Plaintiff's administrative claim.  Because at least six months have passed since submission of these claims, Plaintiffs now exercise their right to treat the claims as denied.  28 U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all available administrative remedies.

22.    Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts and omissions that give rise to this action took place in this District.

## THE PARTIES

23.    Plaintiffs Belinda and her minor daughter Xenia are Salvadoran

---

[6] Chad Mizelle, then Acting General Counsel of DHS, confirmed that Belinda's and Xenia's administrative complaints were received on May 5, 2020, in a letter to Belinda's and Xenia's counsel dated August 13, 2020.

nationals.  In April 2018, Belinda and Xenia fled from El Salvador to the United States seeking asylum.  On or about May 9, 2018, agents of the U.S. Government detained them at a CBP facility in Arizona, and on or about May 11, 2018, agents of the U.S. Government—including CBP agents—forcibly separated Belinda and Xenia.  Belinda and Xenia would not be reunited for more than three years.  Xenia was not released to her father, Belinda's husband, in California until late May of 2018.  Belinda was twice deported to El Salvador and not permitted to reenter the United States until June 19, 2021.  Belinda brings this action on her own behalf and on behalf of Xenia, now age 12.

24.    Defendant United States of America is the appropriate defendant under the FTCA.  28 U.S.C. §§ 1346(b), 2671, *et seq*.

25.    The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies, including, but not limited to HHS, including its sub-agency ORR, and DHS, including its sub-agencies CBP, ICE, and USCIS.

26.    DHS employees were responsible for separating Plaintiffs and had duties connected with their responsibility to care for them during their detention, including facilitating communication between Plaintiffs after they were separated and maintaining certain standards during detention for the health and welfare of Plaintiffs, including additional standards for minor children like Xenia.  The DHS employees who committed the acts and omissions at issue in this case also include those responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Arizona, and later Georgia, where Belinda was detained.  These DHS employees include CBP Border Patrol Agents at the Yuma and Wellton Border Patrol Stations, CBP and other DHS officials with responsibility for tracking detained families and coordinating as to that tracking, and ICE agents operating out of the Irwin County Detention Center in Ocilla, Georgia, including Belinda's Deportation Officer J. Scott.

27.     HHS employees are responsible for supervising and managing the detention of children the U.S. Government classifies as unaccompanied, including at facilities in Florida where Xenia was detained.  These employees' duties to Xenia included facilitating communication with her mother during Xenia's detention and ensuring that the facility maintains the health, safety, and wellbeing of the children, including adequate physical and mental health services, organized educational curriculum, sleeping arrangements, nutrition, and oversight of the facility's employment of facility staff.  These employees include Xenia's ORR Case Officer and any other ORR officers that oversaw the Florida shelter where Xenia was detained or coordinated with DHS to arrange contact between Xenia and her family.

28.     High-ranking officials from the above-named agencies worked together to design and promulgate the unlawful and inhumane family separation policy.  These officials worked together with lower-level officials within DHS and HHS to promulgate the policy, and together these officials executed the policy in a haphazard, negligent, and reckless manner, which subjected Plaintiffs to significant harm, including because the manner of execution of the policy ensured that Plaintiffs would be detained in circumstances below the minimum required for Plaintiffs' health and welfare and would not be properly tracked such that they could maintain communication with one another after their separation.

29.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

### I.     THE PROMULGATION AND IMPLEMENTATION OF THE U.S. GOVERNMENT'S FAMILY SEPARATION POLICY

#### A.     With Its Inhumane Family Separation Policy, the U.S. Government Intended to Inflict Severe Emotional Trauma on Asylum-Seeking Families

30.     Under the Trump Administration, curbing the number of individuals

seeking asylum in the United States was a central focus of the U.S. Government's immigration policy.[7]

31.     To further its goal, the U.S. Government developed and implemented a deliberately cruel Family Separation Policy, which took thousands of children from their parents with knowing intent to cause terror, anguish, and emotional harm.  The purpose of the U.S. Government's cruel policy was to deter future migrants from seeking asylum in the United States.  The family separations—conducted only pursuant to executive policy, not any statute or regulation—violated the law, the U.S. Government's own internal policies,[8] and basic human decency.

[7] *See, e.g.*, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU, Oct. 30, 2018, https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a33217240a539_story.html?noredirect=on&utm_term=.5e3bcec9eead; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019, https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html?action=click&module=Top%20Stories&pgtype=Homepage; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claimsidUSKCN1ND35K.

[8] CBP and ICE officers violated their non-discretionary obligations to abide by their own internal policies and standards when they separated families like Belinda and

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

32.     The U.S. Government used parents and children like Plaintiffs as tools to send a warning to would-be asylum seekers.

**1.     The U.S. Government Began Planning a Family Separation Policy, Knowing It Would Cause Devastating Results**

33.     Beginning in February 2017, DHS officials began considering a policy of separating parents with children arriving at the U.S.-Mexico border as a means of deterring asylum seekers.[9]  The U.S. Government considered this policy even though officials knew of the harm caused when children are separated from their parents.  Months earlier, the DHS Advisory Committee on Family Residential Centers had specifically advised DHS that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children" and results in "traumatic and detrimental impact."[10]

---

Xenia.  Section 1.9 of the Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ["TEDS"] states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."  TEDS at 4, *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.  Section 5.6 of the TEDS on "Detention" states that "Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures."  TEDS at 22.  Because no legal requirement or safety and security required plaintiffs' separation, CBP officers violated this standard by separating Xenia from Belinda.

[9] H.R. COMM. ON THE JUDICIARY, 116TH CONG., REP. ON THE TRUMP ADMINISTRATION'S FAMILY SEPARATION POLICY:  TRAUMA, DESTRUCTION, AND CHAOS 6 (Oct. 2020) ("House Judiciary Committee Report"), *available at* https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separat ion_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519; Julia Edwards Ainsley, *Exclusive:  Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017), https://perma.cc/P7DE-HX5A.

[10] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2, 10 (2016), *available at* https://perma.cc/TZ9C-CUMC.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

34. Not only did the U.S. Government have ample notice of the disastrous effects of the policy during the planning stage, as the separation policy became more widely known it quickly drew additional internal[11] as well as external red flags. Outside organizations such as the American Academy of Pediatrics ("AAP") warned the U.S. Government that the plan would affect "vulnerable, scared children," urging policymakers to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents, or other relatives and caregivers."[12] Nonetheless, then-Secretary of Homeland Security, John Kelly, confirmed that DHS was pursuing the policy "in order to deter more movement" along the route north from Central America taken by many asylum seekers.[13]

### 2. The U.S. Government Launched Its Family Separation Policy with Knowing Intent to Cause, and in Reckless Disregard of, Severe Emotional Harm to Asylum Seekers

35. Despite advance warning of the devastating consequences of family separation, the U.S. Government established a family separation pilot program in CBP's El Paso sector in July 2017. This marked the beginning of a U.S.

---

[11] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also* H.R. SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS, COMMITTEE ON ENERGY AND COMMERCE HEARING (Feb. 7, 2019), Unofficial Transcript at ¶¶ 1006-1024; 1131-1138, *available at* https://perma.cc/F2EV-ZS9W (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services).

[12] Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

[13] House Judiciary Committee Report, *supra* note 9, at 6; *see also* Daniella Diaz, *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (Mar. 7, 2017), https://perma.cc/L4Q9-KVAW.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

Government policy of widespread separation of families, many of whom were seeking asylum, at the country's southern border.

36.     The U.S. Government promulgated this policy specifically intending to deter immigration to the United States.[14]  U.S. Government officials at the highest levels knew of the trauma to children and parents that the policy would cause and embraced that result, believing that publicity about the harms would deter families, including those lawfully seeking asylum, from immigrating to the United States. Numerous sources—both at the highest levels of the U.S. Government and from outside the U.S. Government—document its knowing intent to cause severe emotional harm for purposes of immigration deterrence.  Any law enforcement rationale for the policy was mere pretext.

37.     As part of the El Paso pilot program, CBP targeted for criminal prosecution parents who crossed the border with children.[15]  The U.S. Government detained parents and forcibly took their children away, designated the children as unaccompanied minors (despite their having arrived with at least one parent), and placed the children in the custody of ORR.  Under the pilot program, the U.S. Government separated 281 individuals in families between July and November

---

[14] *See* House Judiciary Committee Report, *supra* note 9, at 21; *see also 60 Minutes, Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird* (CBS Television Broadcast Nov. 25, 2018) (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *Policy Options to Respond to Border Surge of Illegal Immigration*, https://perma.cc/7KRZ-PXW7; *see also* Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/?utm_term=.6fce092b57af.

[15] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-BL-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 3 ("OIG HHS Report II") (Jan. 17, 2019); House Judiciary Committee Report, *supra* note 9, at 7.

1   2017.[16]

2       38.   ORR was ill equipped to process and care for the influx of separated

3   children in its custody.[17]  Because ORR typically dealt only with *genuinely*

4   unaccompanied children, it lacked any formal system for noting that the separated

5   children falsely classified as "unaccompanied" by CBP had parents in DHS

6   custody.  Nor did ORR have a system for tracking where the separated children's

7   parents were detained.[18]

8       39.   In November 2017, Judge Torres in the Western District of Texas

9   sounded the alarm on the chaos of the family separation pilot program, finding that

10  there "appears to be a total lack of information" given to parents separated from

11  their children.[19]  The U.S. Government ignored these concerns.[20]

12      40.   By late 2017, the U.S. Government expanded the pilot from El Paso

13  and was now separating families along the length of the U.S.-Mexico border,

14  including families arriving through official ports of entry.  Notwithstanding the

15  warnings of many within ORR that it lacked the systems needed to handle the surge

16  in children who had been separated from their parents and classified as

17  unaccompanied, DHS discouraged HHS from taking steps to formalize and better

18  prepare for continued increases.[21]

19  ───────────────

20  [16] OIG HHS Report II, *supra* note 15, at 3.

    [17] House Judiciary Committee Report, *supra* note 9, at 8-10.

21  [18] OIG HHS Report II, *supra* note 15, at 6.

22  [19] *U.S. v. Luz*, Nov. 1, 2017 Status Conference, Case No. 3:17-cr-02661-KC (W.D.
    Tex. June 11, 2018).

23  [20] Dep't of Justice, Office of the Inspector General, *Review of the Department of*

24  *Justice's Planning and Implementation of Its Zero Tolerance Policy and Its*
    *Coordination with the Departments of Homeland Security and Health and Human*

25  *Services*, Executive Summary at ii (January 2021) ("DOJ OIG Report") (concluding

26  that, prior to full implementation of the policy, DOJ officials "did not seek readily
    available information" regarding the serious issues with the pilot program, despite

27  concerns from prosecutors and judges regarding "the government's inability in
    many cases to identify the whereabouts of separated children.").

28  [21] *See* H.R. SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS, COMMITTEE ON

                                        - 15 -              FIRST AMENDED COMPLAINT
                                                            CASE NO. CV-21-00215-PHX-SMB

41.     The U.S. Government was encouraged by the disastrous results of the pilot program.  On December 16, 2017, a month after the pilot program ended, senior DOJ and DHS officials exchanged a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[22]  The first section of this memorandum, titled "Increase Prosecution of Family Unit Parents," suggests "[i]nstruct[ing] CBP and ICE to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border," noting that "[t]he parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present with them would be placed in HHS custody as UACs [unaccompanied alien children]."[23]  The memorandum also asserts that "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[24]  The memorandum's second section, titled "Separate Family Units," suggests "[a]nnounc[ing] that DHS is considering separating family units, placing the adults in adult detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs)," and concludes, "[o]nce legal coordination between DHS, HHS, and DOJ is complete, begin separating family units, as stated above."[25]

42.     Family separations continued along the U.S.-Mexico border for

_____

ENERGY AND COMMERCE HEARING (Feb. 7, 2019), Unofficial Transcript at ¶¶ 1012-1024; 1131-1138; 2058-2064, *available at* https://perma.cc/F2EV-ZS9W (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services); *see also* House Judiciary Committee Report, *supra* note 9, at 8-10.
[22] *Policy Options to Respond to Border Surge of Illegal Immigration*, https://perma.cc/7KRZ-PXW7; *see* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC NEWS (Jan. 18, 2019), https://perma.cc/6SVC-9Q3D.
[23] *Policy Options to Respond to Border Surge of Illegal Immigration*, https://perma.cc/7KRZ-PXW7.
[24] *Id.*
[25] *Id.*

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

months after the end of the pilot program, with at least 625 children separated from their parents between December 2017 and March 2018.  This period was marked by the same chaos and tracking deficiencies that plagued the pilot program.[26]

43.    On April 6, 2018, President Trump issued a memo entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[27]  It directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, and the Secretary of Health and Human Services to submit a report detailing all of the measures their respective departments had pursued or were pursuing to end "'catch and release' practices."[28]

44.    "Catch and release" is a pejorative reference to a practice embraced by various administrations of allowing asylum seekers, among other groups of immigrants, to live in the community while awaiting their immigration hearings, rather than be held in government custody.[29]  This practice is in accord with immigration law.

45.    On the same day that President Trump issued his directive, then-U.S. Attorney General Jeff Sessions announced a "Zero Tolerance Policy," extending the practices of criminal prosecution and family separation tested in the El Paso pilot program to the entirety of the southern border.[30]  The Zero Tolerance Policy "fundamentally changed DHS' approach to immigration enforcement," which, except during the family separation pilot program in El Paso in 2017, did not separate a child from an accompanying adult except in very limited circumstances,

---

[26] House Judiciary Committee Report, *supra* note 9, at 10-11.

[27] 83 Fed. Reg. 16,179 (Apr. 6, 2018).

[28] *Id.*

[29] Katie Benner & Charlie Savage, *Due Process for Undocumented Immigrants, Explained*, NY TIMES, June 25, 2018, https://www.nytimes.com/2018/06/25/us/politics/due-process-undocumentedimmigrants.html.

[30] House Judiciary Committee Report, *supra* note 9, at 11.

such as where CBP determined that the adult was not the child's parent or guardian or the adult posed a danger to the child.[31]

46.     Again, sources from within and outside the U.S. Government put DHS, HHS, and DOJ officials on notice of the severe emotional trauma wrought by family separation well before the policy's full implementation.[32]  And throughout the life of the program, news articles and expert reports warning of the severe psychological harm of family separation—from permanent emotional and behavioral problems for children up to and including brain damage—continued to pour in.[33]

---

[31] *See, e.g.*, OFF. OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY 2 (2018) ("DHS OIG Report I"), *available at* https://perma.cc/4E35-DQR5.

[32] *See e.g.*, U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2, 10 (2016), *available at* https://perma.cc/TZ9C-CUMC; Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

[33] *See, e.g.*, Allison Abrams, *Damage of Separating Families:  The Psychological Effects on Children*, PSYCHOL. TODAY (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (Children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress."); *id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Sarah Reinstein, *Family Separations and the Intergenerational Transmission of Trauma*, CLINICAL PSYCHIATRY NEWS (July 9, 2018), https://www.mdedge.com/psychiatry/article/169747/depression/family-separations-and-intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."); Jeremy Raff, *"The Separation Was So Long. My Son Has Changed So Much.": U.S. Border Guards Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply Traumatized Child*, THE ATLANTIC, Sept. 7, 2018, https://www.theatlantic.com/politics/archive/2018/09/trump-family-separation-children-border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight

47.     Despite backlash and urgent warnings, in early May 2018, CBP estimated to the Office of Management and Budget that it would separate *more than 26,000 children* from May through September 2018 under the Zero Tolerance Policy.[34]  At the height of the Zero Tolerance period from May 7, 2018 to June 20, 2018—in which Belinda and Xenia were separated—the U.S. Government separated at least 2,231 children from their parents.[35]

48.     When asked about the policy by NPR on May 11, 2018, John Kelly, by that point President Trump's Chief of Staff, responded that "a big name of the game is deterrence. . . .  It could be a tough deterrent—would be a tough deterrent."[36]  As for the children affected, he said:  "[t]he children will be taken care of—put into foster care *or whatever*."[37]

49.     On June 18, 2018, Fox News's Laura Ingraham asked Attorney General Sessions:  "Is this policy in part used as a deterrent?  Are you trying to

---

response, elongating it into toxic stress that can damage health in both the short and long term[.]"); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains:  A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, THE ATLANTIC, June 22, 2018, https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently affect . . . children's brains, especially if it occurs early in childhood. . . . Studies show that high levels of cortisol[, a stress hormone induced by separation] . . . can suppress the immune system and change the architecture of a developing brain[.] . . . Another stress chemical, corticotropin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory.").
[34] OFF. OF THE INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OEI-09-18-00431, DHS LACKED TECHNOLOGY NEEDED TO SUCCESSFULLY ACCOUNT FOR SEPARATED MIGRANT FAMILIES 17 (Nov. 2019), ("DHS OIG Report II"), *available at* https://perma.cc/GY3G-F8TG.
[35] House Oversight Staff Report (Jul. 2019), *available at* https://perma.cc/ZE5H-9FJZ.
[36] *Transcript:  White House Chief of Staff John Kelly's Interview with NPR*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chiefof-staff-john-kellys-interview-with-npr.
[37] *Id*. (emphasis added).

deter people from bringing children or minors across this dangerous journey?" Sessions replied, "I see that the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration.  So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[38]

50.    On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[39]

51.    While the U.S. Government claimed that it separated families only when the parents were referred for improper entry prosecution, it also separated many families who presented at official ports of entry seeking asylum, revealing that the purported law enforcement rationale was mere pretext.[40]  Additionally, although the U.S. Government claimed that it applied the "Zero Tolerance" prosecutions evenhandedly, CBP targeted parents arriving with children over single adults when making criminal referrals to DOJ.[41]  Even after a court enjoined further separations, CBP continued looking for ways to separate families.[42]  Senior DOJ

---

[38] *The Ingraham Angle* (Fox News television broadcast Jun. 18, 2018), *available at* https://video.foxnews.com/v/5799065216001/#sp=show-clips.

[39] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-theadministration-officials-who-have-said-that-family-separation-is-meant-as-adeterrent/?utm_term=.6fce092b57af.

[40] *See Ms. L. v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) ("[T]he practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.").

[41] *See* TRAC Immigration, Syracuse University, "Zero Tolerance" at the Border: Rhetoric vs. Reality, *available at* https://perma.cc/EK2Q-CJ7G (July 24, 2018).

[42] House Judiciary Committee Report, *supra* note 9, at 18.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

Official Gene Hamilton has since admitted that DOJ would not otherwise have prosecuted immigrant parents arriving with children if DHS did not refer such parents for prosecution.[43]

52.    In response to intense public backlash against the policy, on June 20, 2018, President Trump issued an executive order purporting to end the policy of family separation.  Exec. Order No. 13841, Affording Congress an Opportunity to Address Family Separations (Fed. Register at 83 FR 29,435, June 25, 2018).

53.    On June 26, 2018, Judge Sabraw of the U.S. District Court for the Southern District of California issued a preliminary injunction prohibiting the U.S. Government from separating parents from their children absent a finding of parental unfitness or danger to the child.  He ordered the U.S. Government to reunify parents with children under age five within 14 days and children age five and older within 30 days of the order.[44]

54.    Even after Judge Sabraw's order, President Trump continued to openly promote the deterrence rationale for the family separation policy well after the official end of the Zero Tolerance aspect of the policy, declaring in December 2018 that "if you don't separate, FAR more people will come."[45]  In April 2019, President Trump called the end of the family separation policy a "disaster" that led to a surge in illegal immigration.[46]

---

[43] DOJ OIG Report, *supra* note 20, at 33.

[44] *Ms. L.*, 310 F. Supp. 3d at 1146, 1149.

[45] *See* Donald J. Trump (@realDonaldTrump), Twitter (Dec. 16, 2018, 8:25 AM), https://perma.cc/4EMP-JC34; *see also* Fox News, Interview:  Maria Bartiromo Interviews Donald Trump on Fox Sunday Morning Futures (Apr. 28, 2019), https://www.youtube.com/watch?v=hvUc7ONNTp4 at 1:32-2:21.

[46] Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019, https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.  Mr. Trump's comments starkly contrast with those of former Deputy Attorney General Rod Rosenstein, who called the family separations "a failed policy that never

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

1          55.     Following Judge Sabraw's order, agents of the U.S. Government

2   continued working to cause as much emotional harm as possible to separated

3   families by purposefully delaying reunification and persisting with new family

4   separations.  For example, in June 2018, CBP asked its Border Patrol chiefs and

5   deputies to explore a faster process of separation, prosecution, and reunification,

6   apparently believing separations that were shorter in duration would not violate

7   Judge Sabraw's order.[47]  In July 2018, an ORR field supervisor wrote to ORR

8   Deputy Director Jonathan Hayes to complain that DHS staff were re-interviewing

9   adults about their immigration cases, instead of moving with all reasonable

10  diligence toward the goal of reunification.[48]

11         56.     A DHS directive, issued on June 23, 2018, suggested that once

12  families were separated, only parents who were subject to removal would be

13  reunited with their children, and only "for the purposes of removal."[49]  The U.S.

14  Government forced these parents to choose between their children and returning to

15  the harm from which they fled.

16         57.     In short, from 2017 up to and after the U.S. Government separated

17  Belinda and Xenia, senior government officials made the deliberate choice to cause

18  extraordinary pain and suffering to parents and children.[50]

19  _____

20  should have been proposed or implemented."  Julia Ainsley and Jacob Soboroff,
    *Justice officials respond to report on family separation by blaming Trump,*

21  *expressing regret*, NBC NEWS (Jan. 14, 2021), *available at*
    https://www.nbcnews.com/politics/immigration/justice-officials-respond-new-

22  report-family-separation-blaming-trump-expressing-n1254278.

23  [47] House Judiciary Committee Report, *supra* note 9, at 18.

24  [48] *Id*. at 19.

25  [49] U.S. DEP'T OF HOMELAND SEC., *Fact Sheet:  Zero-Tolerance Prosecution and
    Family Reunification* (June 23, 2018), https://perma.cc/4X33-8C8D.

26  [50] President Trump continued to openly discuss the deterrence rationale for
    pursuing the family separation policy well after the Zero Tolerance aspect of the

27  policy was officially ended, declaring in December 2018 tweet that "if you don't
    separate, FAR more people will come."  *See* Donald J. Trump

28  (@realDonaldTrump), Twitter (Dec. 16, 2018, 8:25 AM), https://perma.cc/4EMP-

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

B.   **The U.S. Government Applied the Separation Policy in a Deliberately and Negligently Inhumane Manner Causing Harm to Families**

58.   U.S. Government officials deliberately and negligently harmed Plaintiffs and other separated families by implementing the policy with callous disregard for the physical safety, emotional well-being, and legal rights of asylum seekers.

59.   The Attorney General announced the Zero Tolerance Policy in April 2018 without any prior notice to certain DHS and HHS (including ORR) officials,[51] purposely giving those employees no time to plan for or coordinate implementation.[52]

60.   As of at least November 2017, near the conclusion of the pilot

---

JC34; *see also* FOX NEWS, Interview:  Maria Bartiromo Interviews Donald Trump on Fox Sunday Morning Futures (Apr. 28, 2019), https://www.youtube.com/watch?v=hvUc7ONNTp4 at 1:32-2:21.  And, in April 2019, President Trump called ending family separation a "disaster" that purportedly led to a surge in illegal immigration.  *See* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019, https://washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5story.html.

[51] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-19-163, UNACCOMPANIED CHILDREN:  AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER 12 (2018) ("GAO Report"), *available at* https://perma.cc/UYZ9-UBYQ ("DHS and HHS officials told us that the agencies did not take specific planning steps because they did not have advance notice of the Attorney General's April 2018 memo."); DOJ OIG Report, *supra* note 20, at 69 ("OAG urged DHS to refer family unit adults to DOJ for prosecution without coordinating with the Southwest border U.S. Attorneys, the U.S. Marshals Service (USMS), the U.S. Department of Health and Human Services, or the federal courts about this policy change and did not seek their input on issues and obstacles it would present.").

[52] A high-ranking HHS official testified before Congress that ORR considered planning for the increase but was specifically told not to.  *Id.*; *see also id.* at 14 ("DHS officials told [HHS leadership] that DHS did not have an official policy of separating parents and children.").

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

program, ORR was aware of an increase in the number of children in its custody, many of them very young, who had been separated from their parents.[53]  Yet, DOJ, DHS, and HHS officials, including agents on the ground, still failed to adequately prepare for the growth of this traumatized population or the needs of these vulnerable detainees when it expanded the pilot to the entire U.S.-Mexico border.

61.     This deliberate and negligent lack of planning resulted in the U.S. Government's failing to provide adequate detention facilities, track separated families, communicate with parents about their children's welfare, facilitate communication between separated family members, release children from CBP custody within the requisite 72 hours, and take basic care to comply with child welfare standards.  All of these failings and more compounded the harms already inflicted on families the U.S. Government had forcibly separated.

**1.     The U.S. Government Subjected Families like Plaintiffs to Dangerous, Unclean Detention Facilities and Deprived Them of Necessities**

62.     As a result of the decision by DHS and DOJ officials to proceed with apprehending and separating thousands of families without appropriate planning,[54] CBP agents placed detained families in dangerously overcrowded and cold holding cells known as *hieleras* (Spanish for "ice box") for days, sometimes more than seventy-two hours, an egregious violation of federal health and safety requirements.

63.     CBP agents failed to provide families with basic hygiene products and

---

[53] *See id.* at 12-13; DHS OIG Report II, *supra* note 34, at 15, 24; House Judiciary Committee Report, *supra* note 9, at 9.

[54] The U.S. government has separated more than 5,000 families at the southern border since 2017. Joint Status Report at 1, 12, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. November 6, 2019), ECF No. 495 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has thus far recognized an additional 1,556 children as part of the expanded class); ECF 439-1 (Pls.' Mem. in Support of Mot. to Enf. Prelim. Inj.) at 7 (noting that government reported 911 child separations between June 26, 2018, and June 29, 2019, after the preliminary injunction was entered); *see also* OIG HHS Report II, *supra* note 15.

facilities, access to safe and sanitary restrooms, adequate food and clean drinking water, warm clothing to withstand the extreme cold of the *hieleras*, or bedding and a proper place to sleep.

64.     These cells were also so overcrowded that the detainees did not have enough room to sit or lie down to rest.  The overcrowding, lack of mattresses and blankets, and constant lighting in the *hieleras* deprived the detained families of sleep.

65.     In subjecting children to inhumane and unsafe conditions in CBP detention, CBP agents violated federal law and policy requiring that minors who are detained by CBP or other DHS agencies, or held in HHS custody, be held in "facilities that are safe and sanitary" and that account for "the particular vulnerability of minors."[55]  CBP agents, including Border Patrol Agents in the Yuma Sector where Belinda and Xenia were held, violated requirements that minors detained by CBP be provided access to toilets and sinks, adequate temperature control and ventilation, and drinking water and food.[56]

66.     Parents like Belinda who were confined for months after being separated from their child were forced to continue enduring the emotional pain of the separation in squalid conditions, as ICE and other DHS agents continued to deprive such parents in immigration detention of basic necessities, like clean water and facilities for hygiene, and withheld from them adequate medical care.

---

[55] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also* U.S. CUSTOMS & BORDER PROT., *U.S. Border Patrol Policy:  Hold Rooms and Short Term Custody* (2008); *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).
[56] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also Flores*, 913 F.3d at 916.

1
2
3

### 2. The U.S. Government Failed to Track Familial Relationships, Deprived Parents of Information about Their Children's Whereabouts and Safety, Taunted Detainees Who Asked Questions, and Interfered with Legitimate Asylum Claims

4

67.     CBP, ICE, and ORR agents and officials exacerbated the trauma of

5

separation by failing to provide information to parents about their children's

6

whereabouts, well-being, and plan for custody.  Border Patrol Agents in CBP

7

facilities also taunted and threatened parents who asked for such information.

8

68.     Although tracking separated children was as simple as adding a

9

checkbox to an ORR/DHS referral page,[57] the CBP agents and officials who were

10

primarily responsible for implementing the policy instituted no "consistent way to

11

indicate in their data systems children and parents separated at the border" until the

12

summer of 2018.[58]

13

69.     The pilot program revealed that CBP and ICE personnel were

14

underprepared to track separated families through its information technology

15

systems.[59]  According to the DHS Office of the Inspector General, CBP personnel

16

"relied on local spreadsheets to document family separations," which led to data

17

errors and "prevented ICE and CBP personnel in other locations from seeing where

18

El Paso Sector Border Patrol agents had separated family members."[60]

19

70.     El Paso sector CBP officials raised concerns to CBP headquarters

20

about technological deficiencies that compromised their ability to track family

21

separations in their computer systems, but headquarters failed to make any changes

22

in response to those concerns.[61]

23

---

24
25
26

[57] *Oversight of the Trump Administration's Family Separation Policy:  Hearing Before the H. Comm. on the Judiciary* (Feb. 26, 2019) (statement of Scott Lloyd, Senior Advisor, Center for Faith and Opportunity Initiatives, U.S. Department of Health and Human Services, at 4), *available at* https://perma.cc/P97Q-JB58.

27

[58] GAO Report, *supra* note 51, *Highlights*; *see also id.* at 16-19.

[59] *See e.g.*, *Luz* Transcript, *supra* note 19.

28

[60] DHS OIG Report II, *supra* note 34, at 14–15.

[61] *Id.*

- 26 -

71.     The pilot program had put DHS and HHS officials on notice of their inability to properly track separated families, as well as the need for better inter- and intra-agency coordination.  But DOJ and DHS officials recklessly pressed on with expanding the practice of family separations to the rest of the U.S.-Mexico border without rectifying the failures in tracking and coordination.[62]

72.     In April 2018, DHS and HHS officials still had not developed the resources needed to track families consistently.  Indeed, officials carried out the upgrades to those systems only after Zero Tolerance was already announced and did not complete them until July 2018, too late for migrants like Belinda and Xenia who were separated in May 2018.[63]   Known deficiencies predictably multiplied when the *ad hoc* tracking methods of DHS and HHS agents failed to keep up with the surge of separated families.  This led to devastating results.

73.     CBP agents also entered inaccurate and incomplete information in its systems and failed to link parents and children as separated families.[64]  These initial errors had a ripple effect through other government tracking systems:  ICE officials could not readily identify parents in its custody who had been separated from their children, and HHS/ORR systems lacked even a field to indicate that a child had been separated from his or her parents until July 2018—creating the field only after a federal court halted the practice of family separation.[65]

74.     One result of this failure was that DHS and HHS officials had no ready records of where the children of thousands of parents were located and could not

---

[62] *See e.g.*, House Judiciary Committee Report, *supra* note 9, at 10 (noting CBP's awareness of the deficiencies in their records system at the end of the pilot program and their subsequent "fail[ure] to make any changes to [their] records systems to fix the tracking problem").

[63] DHS OIG Report II, *supra* at 34 at 7.

[64] *See e.g.*, *id*. at 13-14.

[65] DHS OIG Report II, *supra* note 34, at 13, 21; *see also* House Judiciary Committee Report, *supra* note 9, at 17.

promptly reunite parents and children,[66] even when ordered to do so by a U.S. District Court.[67]  This failure to track people is made all the more egregious by the fact that DHS agents routinely log and keep track of detainees personal property, returning it upon release.[68]

75.    CBP, ICE, and ORR agents' failure to track migrant families who were separated from one another violated their legal duties—including duties under the *Flores* agreement and agency policy—to facilitate contact between family members in detention and to make prompt efforts to release minors to suitable guardians.[69]

---

[66] DHS OIG Report II, *supra* note 34, at 9–11; House Judiciary Committee Report, *supra* note 9, at 18-21 (describing the government's chaotic reunification efforts); Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with their Separated Kids*, WASH. POST (June 21, 2018), https://perma.cc/HQ6W-HLBK; Miriam Jordan, *Torn Apart by Zero Tolerance, Kept Apart by Red Tape*, N.Y. TIMES (June 24, 2018), https://perma.cc/EY2J-XYPT.

[67] *See* Evan Halper, *Federal Investigators Find Many Failures in Trump's Family Separation Policy*, L.A. TIMES (Oct. 2, 2018), *available at* https://perma.cc/ZP4B-HQVE.  These circumstances led the court to conclude that the "unfortunate reality" of the family separation policy was that "migrant children [were] not accounted for with the same efficiency and accuracy as *property*."  *Ms. L.*, 310 F. Supp. 3d at 1144.

[68] *Ms. L.*, 310 F. Supp. 3d at 1144.

[69] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12, Exhibit 2(c) No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997) (ensuring contact with family members); ORR Policy Guide § 3.3.10 (requiring ORR staff to provide children with a minimum of 2 telephone calls per week to family members); *Flores v. Rosen*, 984 F.3d 720, 738, 742 (9th Cir. 2020) (the *Flores* agreement requires officers to "make and record the prompt and continuous efforts on its part toward . . . the release of the minor" and DHS must "release rather than detain minors who do not present a safety or flight risk, as long as a suitable custodian is available" notwithstanding the additional burden on the government from the increase in migrant families); H.R. COMM. ON APPROPRIATIONS, 115TH CONG., REP. ON THE DEPT. OF HOMELAND SECURITY APPROPRIATIONS BILL OF 2018, Report 115-239, at 35 (July 21, 2017) (instructing that ICE officials "ensure that individuals being transferred from CBP to ICE custody, in ICE custody, or under ICE supervision have opportunities to report family separation incidents and to verify the status, location, and disposition of family members" and that field officers be appropriately trained on "mechanisms to reunite family units").

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

76.     After separation, parents and children often did not know each other's whereabouts for extended periods, as was the case with Belinda and Xenia.  CBP and ICE agents failed to provide parents with information regarding the location or well-being of the parents' children or to enable communication between parents and their separated children.[70]  And HHS officials violated federal law and policy requiring that children held in ORR custody be provided "contact with family members."[71]

77.     One Texas federal district court magistrate judge observed in January 2018, when addressing the U.S. Government's failure to track families separated during the 2017 pilot of the family separation policy, that "[t]he practical effect" of this failure was "to create a 'blackout' period where parent and child are wholly incommunicado from each other."[72]

78.     Adding to the harm caused by the separations of families and ensuing lack of information about family members' whereabouts and well-being, CBP and ICE agents frequently insulted, threatened, and taunted parents like Belinda during or after the process of taking their kids from them.[73]

79.     Furthermore, CBP and ICE agents used separation as a means to

---

[70] Halper, *supra* note 67; *see also United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *1–*2, *9 (W.D. Tex. Jan. 5, 2018); House Judiciary Committee Report, *supra* note 9, at 15 (noting the government's inability to put children in contact with their parents for long periods).

[71] *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016) (citing *Flores v. Reno*, Stipulated Settlement Agreement, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997)); *see also* ORR Policy Guide § 3.3.10.

[72] *Dominguez-Portillo*, 2018 WL 315759 at *9.

[73] Children, who were already under the extreme stress of separation, were not spared from insult either.  An audio clip released by ProPublica in June 2018 features children desperately crying out for their mothers and children while a government official callously remarks:  "[w]ell, we have an orchestra here…What's missing is a conductor."  Ginger Thompson, *Listen to Children Who've Just Been Separated From Their Parents at the Border*, Pro Publica (June 18, 2018), https://www.propublica.org/article/children-separated-from-parentsborder-patrol-cbp-trump-immigration-policy.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

pressure parents to relinquish their asylum claims.  They leveraged the emotional distress and fear parents experienced from their children having been taken to coerce them into abandoning their asylum claims, including by amplifying the parents' extreme duress with prolonged separation, pressuring them to sign forms they could not understand, and representing to them over and over that their asylum claims would fail.  ICE agents also had a practice of coercing parents to agree to deportation by deliberately misrepresenting to them that it was the only way to see their children again.

80.    The U.S. Government's actions in coercing parents like Belinda to abandon their asylum claims violated procedural due process, as well as mandatory, nondiscretionary duties under federal statutes and regulations.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. §§ 235.4; 235.3(b)(4); 241.8(e).

### 3.    The U.S. Government's Actions Created Conditions Ripe for Child Abuse and Neglect

81.    DOJ, DHS, and HHS officials ignored applicable child welfare standards in their rush to expand detention capacity to accommodate the influx of families affected by the policy.  In so doing, the officials violated mandatory, nondiscretionary duties.

82.    The family separation policy caused a sudden increase in the number of children, including very young children, in ORR custody.  Despite indicators by mid-2017 that larger numbers of very young children were entering ORR custody, ORR was unprepared to adequately care for these children.[74]

83.    Children age 12 and under are considered "tender aged."[75]  When those children enter ORR custody, they must be placed in special facilities licensed to care for younger children.

---

[74] OIG HHS REPORT II, *supra* note 15, at 6.

[75] *See* DEP'T OF HEALTH & HUMAN SERVS., Latest UAC Data FY-2019, *available at* https://www.hhs.gov/programs/social-services/unaccompanied-alien-children/latest-uac-data-fy2019/index.html.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

84.     The family separation policy caused the number of tender-aged children in ORR custody to swell and exceed ORR's capacity to house them in congregate care facilities.  Facilities such as Cayuga, Lutheran Services, and Bethany Christian Services had to quickly recruit additional foster families and place larger numbers of children in individual foster homes than had previously lived in those homes.

85.     These foster homes were ill prepared to house the number of children who came into their care.  The resulting abuses suffered by children were compounded by ORR's failure to properly plan for a large number of young children in its custody and to monitor the children in these foster homes.

86.     As a result of the failure of DHS and DOJ officials to communicate and plan with HHS officials for the influx of children, overwhelmed ORR shelters were also unprepared to meet the mental health needs of the influx of children of a tender age, had insufficient mental health clinicians available, and could not provide the specialized treatment required for children who had experienced intense trauma related to their separation.[76]

87.     The failure by DHS and HHS officials to ensure that children placed in ORR custody were in "facilities that are safe . . . and that are consistent with the [U.S. Government's] concern for the particular vulnerability of minors" violated their duties under the *Flores* consent decree.[77]

88.     The failures of HHS officials to provide children with appropriate care, including mental health services, and protection from abuse, track separated children, and tell their parents anything about their whereabouts and well-being

---

[76] HHS OIG, COMMUNICATION AND MANAGEMENT CHALLENGES IMPEDED HHS'S RESPONSE TO THE ZERO-TOLERANCE POLICY, OEI- BL-18-00510 at 9, 21-22 (March 2020) ("OIG HHS Report III"),  *available at* www.oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf.

[77] *Flores v. Reno*, Stipulated Settlement Agreement § V ¶ 12.A; *see Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) (holding that *Flores* consent decree "unambiguously applies to accompanied minors").

shows negligence and evinces a motivation to maximize the suffering of the families it separated.

## II.   U.S. GOVERNMENT AGENTS DELIBERATELY TRAUMATIZE BELINDA AND XENIA

### A.   Belinda and Xenia Seek Asylum in the United States

89.   Belinda and Xenia came to the United States to escape violent persecution in El Salvador and seek asylum.

90.   Belinda and Xenia fled El Salvador in late April 2018 and arrived at the U.S.-Mexico border on or about the evening of May 9, 2018.  That same night, only a few days after DHS had implemented the Zero Tolerance policy, Belinda and Xenia crossed the border at or near the city of San Luis, Arizona.

91.   CBP agents, believed to be Border Patrol Agents assigned to the Yuma Sector, apprehended Belinda and Xenia immediately upon their entry.[78]  The agents searched Belinda and Xenia for weapons and asked them for information.  The agents took away Belinda's and Xenia's water bottle and confiscated their identification papers, including Xenia's birth certificate.

92.   The agents then placed Belinda and Xenia into a vehicle for transport to a CBP station along with some others who had recently crossed the border.  The vehicle was exceptionally hot and the air inside was thin.  When Xenia fell asleep, Belinda feared that her daughter had fainted from the heat.  Another woman in the car began to panic and cry due to the heat, leading to taunts from a Border Patrol Agent outside the vehicle.

93.   Belinda and Xenia arrived at an overcrowded CBP station, believed to be the Yuma station, only four days after DHS officials had begun implementing Zero Tolerance.  The Border Patrol Agents threatened, mocked, and ridiculed arriving parents and children with their impending separation.  They carried out the

---

[78] Belinda was not criminally charged for her entry into the United States in May 2018.

separations without any semblance of care or professionalism, wresting children from the arms of their parents and even caging recently separated children together in full view of the other migrant families detained within the facility.

94.     When Belinda and Xenia first arrived, the agents made them sit on the floor along with many other individuals who had recently been apprehended at the border.  Belinda and Xenia waited hours.  Belinda asked the agents for food and water for Xenia, who had not been allowed to eat or drink anything for many hours.  The agents ignored these requests.

95.     After several hours, the agents called Belinda's name and asked her to provide information about herself and Xenia.  Belinda struggled to understand the agents who communicated with her in English and through hand gestures.  Putting together what she could, Belinda discerned that the agents were asking whether she stole Xenia.  The agents then proceeded to instruct Belinda to sign various documents that she could not read nor understand.  Although there were agents present who spoke Spanish, the agents failed to explain or translate the documents they asked Belinda to sign.

96.     A second Border Patrol Agent called Belinda's name for further questioning.  This agent told Belinda, "You know we are going to take your daughter, right?"  Belinda began crying, insisting that they could not separate Xenia from her because Xenia was too young.  The agent laughed.  Xenia overheard this exchange and also became distraught.

97.     Xenia begged Belinda not to allow the officials to take her away.  Belinda tried to reassure her daughter.  But Belinda herself was in disbelief.  Before crossing the border, she had not heard of the U.S. Government separating asylum-seeking parents from their children.

98.     Border Patrol Agents at the facilities chose to detain Belinda and Xenia together with mothers who had already had their children taken from them.  There were many other women in the cell who were crying.  These women warned

Belinda that the agents would soon take her daughter away.

99.    Upon realizing that the agent's warning was true and that Xenia would be taken, Belinda became panicked and began sobbing.  Seeing Belinda in a state of panic, another Border Patrol Agent began laughing at her.  The agent asked if she was upset with the music the agents were playing.  The agent suggested to Belinda that they would take Xenia from her because she did not appreciate the agents' choice of music.

## B.    CBP Agents Keep Belinda and Xenia in Inhumane Conditions Before Their Separation

100.    Compounding the intense fear stoked by the U.S. Government agent's warning about the impending separation were the squalid conditions that Belinda and Xenia endured while in CBP detention.

101.    CBP agents held Belinda and Xenia in a frigid cell crowded with other migrants.  The cell was so crowded, many of the detained immigrants had to sleep sitting up.  The holding cell was also extraordinarily cold.  In addition, the agents kept the light on at all times, further disturbing the detainees' ability to sleep.

102.    Despite the extremely cold conditions, the agents did not provide Xenia or Belinda with clothes, blankets, or anything else to help them keep warm. Another detained individual saw Xenia and Belinda shaking from the cold and offered them a thin aluminum sheet.  Even with the aluminum sheet, Belinda and Xenia continued to shiver from the cold and huddled together for warmth.

103.    CBP agents also failed to provide the necessities for basic hygiene and cleanliness.  They did not give Belinda and Xenia any hygiene products, such as soap, toothbrushes, or toothpaste.  And they did not provide any facilities for showering or washing up.

104.    CBP agents did not provide adequate nutrition.  It fed the detained individuals two small meals a day and gave them provisions that were past the expiration date.  Belinda remembers eating only ramen noodles.  The children

received some sort of cracker snack.

105.   CBP agents never gave Belinda and Xenia any bottled water.  Instead, if detainees wanted water, they had to drink from the faucet in one of two small bathrooms.  Those bathrooms were filthy and rarely cleaned.  Used diapers piled up inside.  Many children became ill and used these bathrooms to throw up.

106.   Xenia's scalp became very itchy and irritated.  Belinda suspects that her daughter got lice from sleeping on the floor and living in cramped conditions with people who were deprived of the resources to properly wash themselves.

107.   From their cell, Belinda could see another cell or room full of crying children without any accompanying parents.  Belinda understood that these children had recently been taken from their parents and were awaiting some sort of processing.  Imagining Xenia in those conditions filled Belinda with dread.

108.   These conditions violated the agents duties to detainees, including those embodied within the *Flores* agreement, which require that facilities in which minors are detained provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor.  They also violate CBPs standards for Transport, Escort, Detention, and Search ("TEDS Standards"), which require clean and sanitary facilities with capacity limits, provision of basic personal hygiene items, food, clean water and cups, clean bedding, and prohibit officers from using temperature controls in a punitive manner.[79]

### C.   U.S. Government Agents Take Xenia Away

109.   DHS agents took Xenia from Belinda on or around the early morning of May 11, 2018.

110.   On that morning, at the beginning of Belinda's and Xenia's third day

---

[79] TEDS Standards §§ 4.3, 4.6, 4.7, 4.11, 4.12, 4.13, 4.14, and 5.6.

in custody, a group of agents called their names.  These agents are believed to be CBP agents, but may have included agents from other DHS departments, such as ICE.  Belinda, afraid that the agents intended to take Xenia, hesitated to wake her and respond to the agent.  A CBP agent told Belinda that if she did not wake her daughter, he would enter the cell and forcibly remove Xenia himself.

111.   The agents first made Belinda and Xenia stand in a line with other parents and children waiting to provide officials with information.  At this time, Belinda and Xenia witnessed U.S. Government agents snatch a young boy from his mother's arms near the front of the line and shove the crying mother away.

112.   The children were filthy due to the unsanitary conditions in which they had been kept.  Recognizing this, the U.S. Government agents informed the parents that the children needed to bathe because they "can't have dirty kids on the plane." Belinda begged the federal agents to allow her to bathe Xenia since Xenia was so young and her scalp was irritated and hurting.

113.   After the children were bathed, the agents told the sobbing parents that they were now taking the children.  Belinda held Xenia and wept, repeatedly apologizing to her for what was happening.

114.   Belinda could not understand the agents when they spoke only in English.  But from their body language, facial expressions, and gestures, Belinda recognized that they were taking pleasure in the trauma they were inflicting.  Some agents laughed as the children were separated from their parents.

115.   One Spanish-speaking agent insisted the parents were making things harder than they had to be and shouted that they cut short their goodbyes.  Another agent scolded the grieving parents that their cries were inflicting trauma on the children.

116.   As the agents led Xenia and the other children away, Belinda and many other parents pleaded with the agents for information about where the children were being taken.  The agents refused to tell the parents where the children

were going or what would happen to them.

117.   Xenia was put in a van filled with other crying children and driven to the airport by a woman believed to be a DHS or HHS agent, who treated the children in a hostile and dehumanizing manner which further traumatized Xenia. The children were provided a snack when they arrived at the airport.  The woman escorting them shouted at Xenia for eating with her mouth open.  The children, who had just been taken away from their parents without explanation, were terrified. Many of them had probably never been on a plane before.  One boy became upset because he had something stuck in his eye.  The agent yelled at the boy to be quiet and made fun of him for complaining.  Then she put the children on the plane and escorted them on their flights.  The last plane took them to Miami.

### D.   Belinda and Xenia Are Not Allowed to Speak for Ten Days

118.   For approximately ten days, the CBP agents refused to provide Belinda with any information about Xenia's whereabouts or safety.  Following the separation, the U.S. Government agents all but ignored Belinda and the parents whose children had already been taken.  The agents never made any attempt to put Belinda in touch with Xenia.  This was a violation of their duty to provide contact between Xenia and Belinda after they were arrested together.  These agents included the Border Patrol Agents at the Yuma and Wellton stations and the ICE Deportation Officer assigned to Belinda, as well as Xenia's ORR Case Officer and other ORR officials responsible for the Florida shelter's handling of the children, and the DHS and HHS officials with responsibility for tracking separated families.

119.   In the days following the separation, a CBP agent called Belinda to sign some papers.  Belinda could not understand these papers because they were only in English, which Belinda could not read, write, or speak.  The agent did not translate for her.  During this encounter, Belinda asked the agent where they had taken Xenia.  The agent barked in Spanish that he had summoned Belinda to sign papers, not to give her information.

120.   Belinda began to believe the agents were never going to tell her where Xenia was.  Over the ten days following the separation, Belinda suffered from intense anxiety and was unable to eat or sleep.  The sounds of other children in the facility constantly reminded her of Xenia and their traumatizing separation.

121.   After approximately ten days, a Spanish-speaking woman whom Belinda believed was a social worker called the facility to speak to Belinda.[80]

122.   The woman informed Belinda that Xenia was in Florida in the custody of ORR.  She told Belinda that she was working to secure Xenia's release.  During the conversation, Belinda could hear her daughter's cries in the background.

123.   The woman explained that many of the children in ORR detention had been having trouble eating and sleeping and disclosed to Belinda that Xenia had been crying a lot.  She asked Belinda to remain calm during the call so that her daughter would not become emotional.

124.   When Belinda was allowed to speak with Xenia, the conversation was short.  Xenia was crying too hard to be able to say more than a few words.  She told Belinda that she did not want to be where she was and could not eat or sleep.

125.   The agents at the detention facility appeared to Belinda to have had no role in facilitating the call with Xenia.  Belinda believes that had the woman not located her and arranged the call, Belinda and her daughter would not have been allowed to speak.  This was the only call Belinda had with Xenia while Xenia was in ORR custody.

126.   At minimum, the Border Patrol Agents at the facilities in which

---

[80] Belinda's belief that this phone call was not even facilitated by DHS or HHS officials is corroborated by DHS OIG's own internal investigation documenting the failure of U.S. Government employees to arrange communications between separated parents and their children in HHS custody.  DHS OIG Report II, *supra* note 34, at 14 (finding that only 2 of 12 interviewed parents in one detention facility reported receiving any assistance from ICE personnel and that 4 of the 6 parents who spoke with their children were able to do so with the assistance of social workers, legal representatives, or non-detained family members).

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

Belinda was housed in the Yuma Sector should have updated her on her daughter's condition and status and should have arranged communication between her and her daughter. Their failure to do so was either deliberate and/or the result of negligence, including the insufficiency of CBP agents' *ad hoc* methods for tracking separated families and the failure of higher level CBP and other DHS officials to plan for and implement an appropriate tracking system before beginning the practice of separating nearly all migrant families.

### E.    Xenia Spent Over Two Weeks in ORR Custody in Florida

127.   After Xenia arrived at the Florida ORR facility, none of the ORR agents gave her any explanation about why she was there or what was happening to her. Xenia was put in classes. She did not know what the classes were about because they were all in English.

128.   Xenia was not adequately nourished or cared for at the facility. Xenia was so grief stricken and depressed that she was unable to eat. No one she encountered at the facility seemed to notice or care that Xenia was not eating enough food. No one asked her what was wrong or encouraged her to eat. She suffered from dizzy spells due to the lack of adequate nutrition. Xenia also barely slept.

129.    ORR requires that children be provided with a minimum of at least one individual counseling session per week from a trained mental health clinician. The staff at the ORR facility told Xenia that there was someone available to speak to if she felt sad or upset. But when Xenia approached the staff to seek the counseling services they had told her about, they denied her request.

130.   There were some older children at the facility, who seemed to Xenia to have been between the ages of 14 and 16. Sometimes the ORR agents would leave the younger children like Xenia alone in the care of the older girls for as much as two hours at a time. One of the older girls told Xenia she would be in the shelter

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

1   forever and her parents would never come for her.

2   131.   After about nine days at the facility, Xenia finally met with a woman

3   who would be working to get her reunited with her father.  To the best of Plaintiffs'

4   understanding, this woman was a social worker and not a government employee or

5   member of the facility staff.  Xenia told the woman that she wanted to see her mom.

6   When the woman later arranged a call to Belinda, Xenia was only able to speak to

7   her for two minutes before the call disconnected.

8   132.   A few days later, Xenia was able to take a call from her dad.  He told

9   her he had been trying to find her.  Xenia was crying.  She asked if her dad could

10  get her out of there.  He told her he was trying but that he did not know.

11  133.   It was not until on or about May 26, 2018, approximately 15 days after

12  her separation from Belinda, that ORR released Xenia to her father in California.

13  Xenia's father, with his limited income, had to pay for the plane ride from Florida

14  to California.

15  134.   At minimum, DHS and HHS officials with oversight into the ORR

16  shelter system should have ensured that staff at the ORR facility, including Xenia's

17  ORR Case Officer, could have updated her on her mother's condition and status

18  and arranged communication between her and Belinda.  The failure of DHS and

19  HHS officials to do so was either deliberate or the result of negligence, including

20  the insufficiency of DHS and HHS officials' methods for tracking separated

21  families.[81]  That it took over two weeks for Xenia to be released to her father also

22  violate the duties owed to Xenia by DHS and HHS officials and agents.[82]

23  _____

24  [81] *See supra* note 69 (the *Flores* agreement and ORR policy require more contact
    with family members); OIG HHS REPORT III, *supra* note 76, at 25-26 (facilities

25  experienced difficulties and delays in locating and contacting the detained family
    members, particularly in May and June 2018, including because information on the

26  tracking tool was out of date, facility staff often had to directly call detention

27  centers directly to try to locate parents, and detention centers ignored and even

28  blocked calls from ORR staff).

[82] *See id.* (efforts to release a minor to family members must be prompt and

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

1

### F. Belinda Experiences a Prolonged Detention

2   135.   CBP and ICE agents detained Belinda from May 9, 2018 to November

3   16, 2018.  She was never prosecuted.  She was not transferred to U.S. Marshalls

4   custody for prosecution before or after the separation.  Instead, she remained in

5   CBP custody for approximately two weeks before being transferred to civil

6   immigration detention in an ICE facility.

7   136.   During Belinda's detention, CBP and ICE agents compounded the

8   emotional pain of her forcible separation from Xenia.  For seven months, Belinda

9   was deprived of liberty, afforded minimal information regarding her case, shuttled

10  around from detention center to detention center in shackles, forced to live in

11  inhumane conditions, and repeatedly told she would lose her asylum claim.

12  Belinda had no idea when she would see an immigration judge or whether she

13  would ever be released or see her daughter again.

14  137.   During her lengthy detention, DHS officials transferred Belinda

15  between many different detention facilities.  In the first few weeks of detention,

16  Belinda was held in CBP facilities: first the Yuma Border Patrol Station in Yuma,

17  Arizona, then the Wellton Border Patrol Station in Wellton, Arizona, and then back

18  to the Yuma Border Patrol Station.  Belinda recalls being moved to a facility named

19  "Santa Cruz" (presumably in Santa Cruz County, Arizona).  Finally, the U.S.

20  Government moved Belinda across the country to a detention center in Ocilla,

21  Georgia.

22  138.   During these transfers, agents shackled Belinda's ankles and wrists.

23  During one transfer, Belinda was not provided with socks, and so the shackles cut

24  into her ankles during the journey.

25  139.   With the exception of her transfer to the Ocilla, Georgia facility, the

26  U.S. Government never told her where she was going or why she was being

27  transferred.  Each time she would believe that the U.S. Government was in the

28  ───────────────

continuous).

1   process of deporting her, but each time she would only find herself in a new

2   detention facility.

3       140.   These transfers also harmed Belinda's ability to communicate with her

4   family.  Several weeks, possibly a month or more, passed before Belinda and Xenia

5   were able to speak again.  On top of having to pay for the calls on a limited income,

6   Belinda's husband had to figure out where she was being held after every transfer

7   to arrange another call.  Belinda was given so little time on each call that she barely

8   had time to communicate with both her husband and Xenia.

9       141.   At the Santa Cruz detention center, Belinda learned that some families

10  were being reunited after seeing on a television in the detention center a news

11  report that a court had ordered the government to reunite families and hearing from

12  a fellow detainee that the U.S. Government was reuniting some families.

13      142.   She remembers hearing that the U.S. Government was reuniting some

14  of her fellow detained parents with their children.  Belinda asked U.S. Government

15  agents why she was not being reunited with her daughter, but none of the agents

16  responded to her inquiry.

17      143.   When the U.S. Government transferred Belinda to the Irwin County

18  Detention Center in Ocilla, Georgia, agents finally explained that she would wait

19  there until the resolution of her asylum claim.

20      144.   Belinda came to believe that the U.S. Government moved her from

21  Arizona to Georgia because the jurisdiction is more favorable to deporting asylum-

22  seeking immigrants and having her asylum claim adjudicated there made it more

23  likely that the claim would be denied.[83]

24      145.   Once in Ocilla, Belinda's symptoms of distress continued and she sank

25  _____

26  [83] *See e.g.*, Adrienne Pon, *Identifying Limits to Immigration Detention Transfers*

27  *and Venue*, 71 STAN. L. REV. 747, 749 (2019) (describing the government's "almost
    unfettered discretion" to transfer immigrant detainees, often resulting in transfers to
    jurisdictions hostile to immigrants, and noting frequent transfers to the Eleventh

28  Circuit, which includes Georgia).

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

deeper into depression.  She cried constantly.  And she began having chest pains,
headaches, and difficulty breathing.  She could barely eat or sleep.

146.   Another detained woman in the Ocilla, Georgia facility warned
Belinda that if she did not eat, the facility's officials would place her in isolation.
Belinda forced herself to eat to avoid isolation.

147.   In Ocilla, the only drinking water available to Belinda came from two
dirty bathrooms shared by hundreds of detainees.  Belinda was concerned that the
water was unsanitary and might make her ill and therefore often went long periods
without drinking any water.

148.   Belinda's chest pains, difficulty breathing, and headaches required
medical attention, so Belinda was provided access to a doctor in the facility.  The
doctor did not speak Spanish, however, and the facility did not have an interpreter
on site.  Instead, the Spanish-language interpreter was available only via telephone.
Because of the difficulty communicating, Belinda's consultation with the doctor
was confusing to her.  While the doctor gave Belinda pills to take for her
symptoms, Belinda was not aware what medicine she had been given.

149.   Even though she did not know what she had been prescribed, Belinda
took the medicine.  But the pills helped only slightly with Belinda's headaches, and
her symptoms continued largely unabated.  Belinda subsequently explained to the
doctor that she was still experiencing the same symptoms.  To the best of Belinda's
knowledge, the doctor never prescribed her with any additional medication.

150.   Belinda also spoke with a mental health employee at the facility for
her depression and insomnia.  She asked for medicine to help her sleep.  But the
mental health employee told her the facility could not provide her with such
medication.

151.   In May 2021, ICE was ordered to terminate its contract with the Irwin
County Detention Center due to conditions at the facility that the DHS admitted
were "unacceptable," after a federal investigation was launched into whistleblower

claims of abuses against migrant detainees, including the failure to provide adequate medical care.[84]

152.   Belinda underwent a credible-fear interview with a USCIS asylum officer in Georgia on July 3, 2018.  The asylum officer found that Belinda had a credible fear of persecution.

153.   Despite the fact that Belinda arrived in the United States in early May and received a positive credible fear finding on or about July 3, Belinda did not see an immigration judge until on or about October 23, 2018.  On that day, Belinda had a custody redetermination hearing (also called a "bond" hearing) before an immigration judge to determine whether she could be released from immigration detention while her asylum case was pending.  She retained an attorney who attended her bond hearing.  Belinda was not allowed to be physically present at the bond hearing, but attended via video-conference from the detention facility.  Other than a few preliminary, biographical questions and the outcome of the hearing, none of the proceedings were translated for her.  Belinda was not permitted to speak other than to answer the basic biographical questions posed to her during the proceedings.  The immigration judge denied Belinda's bond, labeling her a "flight risk" despite her clear intent to reunite with her family living in a known location in California.

154.   Prior to this ruling, ICE agents frequently told Belinda that her asylum claim would probably be denied and that she would be deported.  In doing so, these

---

[84] Maria Sacchetti, *ICE to stop detaining immigrants at two county jails under federal investigation*, THE WASHINGTON POST (May 20, 2021) *available at* https://www.washingtonpost.com/immigration/ice-detentions-county-jails-halted/2021/05/20/9c0bdd1e-b8de-11eb-a6b1-81296da0339b_story.html; *see* Letter from Project South to DHS OIG, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center* (Sept. 14, 2020) (whistleblower complaint) *available at* https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf.

officials diminished nearly any hope Belinda had of seeing her daughter again and added to the staggering emotional pain that she had already experienced.  The immigration judge's bond denial dealt a final blow.

155.   By the time of her bond denial, Belinda had endured seven months of isolation, captivity, depression, anxiety, and the acute physical ailments that arose from many months of barely sleeping, eating, or drinking water.  Belinda's seemingly indefinite detention, the denial of her bond, and the repeated representations by various U.S. Government officials disparaging her chances of successfully claiming asylum filled her with hopelessness and compounded the emotional pain of her separation from Xenia.  Overwhelmed, exhausted, and disheartened, Belinda signed her deportation order to El Salvador in November 2018.[85]

### G.     Belinda and Xenia Were Not Reunited for Over Three Years

156.   Desperate to be reunified with her daughter, Belinda left El Salvador and tried to reenter the United States within weeks of her deportation.

157.   The U.S. Government apprehended Belinda at the border on or about December 17, 2018, detained her until March 2019, and deported her once more to El Salvador.

158.   Belinda's hopes of seeing her daughter again faded with her second deportation.  After returning to El Salvador again, she fell further into depression.  And Xenia too had to cope with the realization that she would not see her mother any time soon.  This reality has put a strain not only on Belinda and Xenia's mental

---

[85] *See e.g.*, Order Granting In Part and Denying In Part Plaintiffs' Motion to Allow Parents Deported Without Their Children to Travel to the United States, *Ms. L.*, Case No. 3:18-cv-00428 (Sept. 4, 2019), ECF No. 456 (finding issues of voluntariness and granting motion to travel to the U.S. for several parents, including one mother, B.L.S.P., who was overcome by the stress of separation and one father, O.U.R.M., who was overcome by a U.S. Government official disparaging his chances of success).

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

health but on their relationship as mother and daughter.

159.    It was not until June 19, 2021, that government officials permitted Belinda to reenter the United States.  After her admission to the United States, Belinda met with DHS Secretary Alejandro Mayorkas and other DHS officials as a part of a group of approximately 5 mothers invited to discuss the immense toll of family separation.  During that meeting, the DHS Secretary personally apologized to Belinda for the ordeal she and her daughter suffered at the hands of DHS agents.

**H.    Belinda and Xenia Continue to Suffer Emotional and Physical Harm.**

160.    The facts alleged above have had a deep emotional toll on Belinda and Xenia, in particular as a result of the circumstances of the separation and the ten days when they were not allowed to speak and given no information about one another.

161.    Belinda is very depressed, as confirmed by a mental health professional from whom Belinda has sought treatment.

162.    Belinda suffers emotional distress whenever she thinks or speaks of the events she and Xenia endured, including the separation from her daughter, and the demeaning treatment she experienced during her detention and separation from her daughter.  Her trauma manifests as depression, sadness, and anxiety, and she continues to suffer from insomnia and lack of appetite.

163.    Xenia continues to suffer the effects of her detention and separation from her mother.  She is now 12.  She experiences symptoms consistent with severe emotional distress and post-traumatic stress.

164.    Upon Xenia's release, she looked gaunt, exhausted, and depressed. When she was first released to her father in California, she asked about Belinda constantly.  She cried frequently, ate very little, and had trouble sleeping.  Her eating habits have suffered greatly from her ordeal.  After weeks of malnourishment in CBP and ORR custody, she began eating again, but has experienced confusion

and difficulty in her relationship with food since then.  For example, after Xenia engage in what she perceived as overeating, she began restricting her intake of food.  These are symptoms of disordered eating.  She did not have these symptoms prior to the separation from her mother.

165.   Xenia has experienced emotionally volatility.  Unlike before the separation, she now cries easily at the slightest provocation.  Xenia frequently expresses her pain from the ordeal.  And Xenia still has great difficulty discussing the circumstances of her separation from her mother and her detention in the custody of CBP and ORR agents.  Before Xenia was reunited with her mom, she had trouble accepting the reality of the separation, such as when she told Belinda that she would not cut into her birthday cake until Belinda arrived in the U.S. When the family was on an outing prior to being reunited with Belinda, Xenia would ask to take a picture of the outing for Belinda.  And at meals, she would ask to save some of the food for Belinda.  Xenia's feelings of joy were cut short by a constant yearning for her mother's company.

166.   Separating a child as young as Xenia from her parent has long been known to cause significant short- and long-term damage to mental, physical, and emotional health.[86]  Children attach to their caregiver from the time they are born, and a child's sense of safety "depends on that relationship."[87]  Disrupting that relationship causes "the parts of the brain that deal with attachment and fear" to "develop differently."[88]  It is not surprising, then, that "[s]eparation irreparably harms [families] every minute it persists."[89]

167.   The AAP has explained the effects of separation on children:

[86] *See Ms. J.P. v. Sessions*, 2019 WL 6723686, *40-41 (Nov. 5, 2019 C.D. Cal.) (granting preliminary injunction and ordering the government to provide free mental health care to families who were separated).

[87] William Wan, *What Separation from Parents Does to Children:  'The Effect is Catastrophic'*, WASH. POST (Jun. 18, 2018), https://perma.cc/7MA6-X7MB.

[88] *Id*.

[89] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018).

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

"[H]ighly stressful experiences, like family separation, can . . . disrupt[] a child's brain architecture and affect[] his or her short- and long-term health.  This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[90]  Children who experience trauma like forced separation from a parent "are at a much greater risk of developing mental health disorders such as depression, anxiety, addiction, Attention Deficit Hyperactivity Disorder ('ADHD') and PTSD.  Their physical health is also negatively affected."[91]

168.    The current symptoms Xenia is experiencing are consistent with the effects of separation from a parent and a child of tender age who experiences traumatic events. As a direct and proximate result of the actions of the CBP and ORR agents and officials who were responsible for her care while in detention— including the Border Patrol Agents in the Arizona CBP facilities and the ORR Case Officer and other ORR officials responsible for her care in Florida—Xenia will suffer lifelong harm.

### III.    CONSEQUENCES OF THE U.S. GOVERNMENT'S WRONGFUL ACTS

169.    The agents of the U.S. Government responsible for enacting the Zero Tolerance policy knew that forcibly separating Plaintiffs would fill them with terror, desperation, and anguish.  Indeed, that was the point.  The actions of DHS and HHS agents, including at CBP, ICE, and ORR, who detained and separated Belinda and Xenia, harmed Plaintiffs through intentional and negligent acts.  The

---

[90] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 503 (quoting Colleen Kraft, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Children and Parents at the Border (May 8, 2018), https://perma.cc/23ET-GN7S); *see also* Allison Abrams, LCSW-R, *Damage of Separating Families:  The Psychological Effects on Children*, PSYCHOL. TODAY (Jun. 22, 2018), https://perma.cc/H967-BBWV (Because a child's "secure attachment comes from the child's perceptions of his or her caregiver's availability (physical accessibility) . . . separations as brief as one week in duration could negatively impact the quality of attachments.").
[91] Abrams, *supra* note 33.

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB

agents' deliberate and negligent conduct include: DHS officials and its agents at CBP and ICE detention facilities (including CBP Border Patrol Agents in the Yuma Sector and Belinda's ICE Deportation Officer and other ICE agents responsible for her care at the Irwin County Detention Facility, as well as DHS officials who failed to properly plan the execution of the policy) tormenting Plaintiffs with statements designed to maximize their fear and distress, circumstances of detention that violate legal duties and government policies for detention of individuals and families, and executing the separation of Plaintiffs without professionalism, care, or a minimal level of decency and respect for Plaintiffs and other families that were being separated; DHS and HHS officials and agents' (including CBP Border Patrol Agents in the Yuma Sector, Belinda's ICE Deportation Officer, Xenia's ORR Case Officer, and DHS and HHS officials with responsibility for planning the implementation of and inter-agency communication about the policy) deliberate or negligent failure to track Plaintiffs and to provide them with contact with one another or other information about each other's well-being, in violation of legal duties and agency policy; and the conduct of HHS officials (including Xenia's ORR Case Officer and other ORR officials) responsible for oversight and management the Florida facility who failed to ensure Xenia would be provided with adequate food and medical and mental health care in violation of legal duties and agency policy.

170.    All of these actions directly and proximately caused Plaintiffs' harm, including physical and mental symptoms of trauma and severe emotional distress.

171.    Plaintiffs will carry the harm done to them for the rest of their lives. The U.S. Government's conduct here is unconscionable, and it cannot be excused in a civilized society.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

172.   Plaintiffs re-allege each allegation in the preceding paragraphs as though fully set forth here.

173.   The U.S. Government, federal officials, and federal employees referenced above engaged in extreme and outrageous conduct with an intent to cause, or at least a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

174.   The behavior of the U.S. Government, federal officials, and federal employees referenced above was extreme and outrageous under the circumstances, particularly in light of Plaintiffs' recent flight from persecution.

175.   As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress throughout their time in the U.S. Government's custody and continue to suffer the lasting effects of that distress today.

176.   Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the U.S. Government is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT TWO**
**NEGLIGENCE**

177.   Plaintiffs re-allege each allegation in the preceding paragraphs as though fully set forth here.

178.   The U.S. Government officials, agents, and employees referenced above had a legal duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

179.   The U.S. Government officials, agents, and employees referenced above failed to act with ordinary care and breached their duty owed to Plaintiffs, including by neglecting the above-referenced mandatory, nondiscretionary duties.

180.   As a direct and proximate result of the above-referenced breaches of duties that the U.S. Government officials, agents, and employees owed to Plaintiffs, Plaintiffs suffered substantial damages, including the harm described above.

181.   Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the U.S. Government is liable to Plaintiffs for negligence.

**COUNT THREE**
**LOSS OF CHILD'S CONSORTIUM**

182.   Plaintiffs re-allege each allegation in the preceding paragraphs as though fully set forth here.

183.   Xenia suffered severe, permanent, and disabling injuries, including long-term mental health effects and trauma caused by the U.S. Government, federal officials, and federal employees referenced above.

184.   Those injuries and Plaintiffs' continued separation substantially interfere with Xenia's capacity to interact with her mother in a normally gratifying way.

185.   Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the U.S. Government is liable to Belinda for loss of consortium.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand as follows:

A.    Compensatory damages;

B.    Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.    Such other and further relief as the Court may deem just and appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all issues so triable.

DATED this 21st day of October, 2022.

PERKINS COIE LLP

By /s/ Joel W. Nomkin (with permission)
    Joel W. Nomkin
    Christopher D. Thomas
    Austin Yost

O'MELVENY & MYERS LLP

By /s/ David Almeling
    David Almeling*
    R. Collins Kilgore*

[*Admitted pro hac vice]

FIRST AMENDED COMPLAINT
CASE NO. CV-21-00215-PHX-SMB